[S.F. No. 24803. Apr. 3, 1986.]

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,
Petitioner, v.
PUBLIC EMPLOYMENT RELATIONS BOARD, Respondent;
CALIFORNIA ASSOCIATION OF INTERNS AND RESIDENTS,
Real Party in Interest.

602

**COUNSEL**

Donald L. Reidhaar, James N. Odle, Claudia Cate and Edward M. Opton, Jr., for Petitioner.

James Severson, McCutchen, Doyle, Brown & Enersen, Carl W. Vogt, Joseph T. Small, Jr., and Fulbright & Jaworski as Amici Curiae on behalf of Petitioner.

Dennis M. Sullivan, Jeffrey Sloan, Marian Kennedy, Andrea L. Biren and Emily E. Vasquez for Respondent.

Hassard, Bonnington, Rogers & Huber, David E. Willett and Richard R. Sheridan as Amici Curiae on behalf of Respondent.

Franklin Silver, Beeson, Tayer & Silbert and Rosenthal & Leff for Real Party in Interest.

Fred H. Altshuler, Marsha S. Berzon and Altshuler & Berzon as Amici Curiae on behalf of Real Party in Interest.

## OPINION

BIRD, C. J.—The Regents of the University of California (University) petitions for review of a decision by the Public Employment Relations Board (PERB or the Board). The Board found that housestaff,[1] who are paid by the University while participating in residency programs at clinics, institutes or hospitals owned or operated by the University, are "employees" within the meaning of Government Code section 3562, subdivision (f)[2] of the Higher Education Employer-Employee Relations Act (HEERA or the Act) (§ 3560 et seq.). Therefore, they are entitled to collective bargaining rights. This court must review the propriety of that ruling.

### I.

Prior to July 1, 1979, Physicians National Housestaff Association (PNHA) chapters representing housestaff at the Irvine, San Francisco and Davis campuses participated in meet-and-confer sessions with representatives of different hospital administrations. During this period, PNHA also received payroll dues deductions from its members' paychecks.

In 1978, the California Legislature enacted HEERA, which extended collective bargaining rights to employees of the University of California, Has-

---

[1] "Housestaff" is a shorthand term used to describe medical interns, residents and clinical fellows. In the past, an individual in the first year of a residency program was called an "intern." That term is no longer used. Such an individual is now referred to as a "Resident I" or a first-year resident. The term "clinical fellow" describes those persons who have completed their residencies in recognized areas of medical specialization and are continuing to train in a medical subspecialty.

[2] Section 3562, subdivision (f) provides: "'Employee' or 'higher education employee' means any employee of the Regents of the University of California, the Directors of Hastings College of the Law, or the Board of Trustees of the California State University, whose employment is principally within the State of California. However, managerial, and confidential employees shall be excluded from coverage under this chapter. The board may find student employees whose employment is contingent on their status as students are employees only if the services they provide are unrelated to their educational objectives, or, that those educational objectives are subordinate to the services they perform and that coverage under this chapter would further the purposes of this chapter." Hereafter, this provision will be referred to as subdivision (f).

All statutory references are to the Government Code unless otherwise noted.

tings College of the Law and the California State University.[3] (§ 3560, subd. (b).) Shortly after HEERA became effective (July 1, 1979), the University notified PNHA that it did not consider housestaff to be "employees" within the meaning of the Act. It then ceased making payroll deductions from housestaff salaries to pay PNHA dues. On July 20, 1979, PNHA responded by filing an unfair labor practice charge against the University, alleging that the University had violated section 3571, subdivisions (a) and (b) and section 3585, by refusing to make such deductions.[4]

A hearing before a PERB hearing officer ensued. The evidence consisted of the following:[5]

The University operates medical schools at five of its campuses: Los Angeles (UCLA), San Diego (UCSD), San Francisco (UCSF), Irvine (UCI) and Davis (UCD). Through its medical schools, the University provides residency training programs in most medical specialty and subspecialty areas and operates hospitals at which housestaff gain clinical experience. Other hospitals, both public and private, are also affiliated with these medical schools. Many housestaff rotate through these hospitals during the course of their training.

In the spring of 1979, approximately 4,500 housestaff were participating in University residency programs. Approximately 2,000 of them were on the University payroll. The others were paid by the affiliated institutions at which they served.

In order to participate in a University residency program, an individual must have graduated from medical school with a doctor of medicine (M.D.)

---

[3]Employees of these institutions were among the last California public employees to be accorded collective bargaining rights. (Brownstein, *Medical Housestaff: Scholars or Working Stiffs? The Pending PERB Decision* (1981) 12 Pacific L.J. 1127 [hereafter *Scholars or Working Stiffs*].)

PERB administers HEERA (§ 3563), the State Employer-Employee Relations Act (SEERA) (§ 3512 et seq.) which accords collective bargaining rights to state civil service employees, and the Educational Employment Relations Act (EERA) (§ 3540 et seq.) which accords collective bargaining rights to public school employees other than those covered under HEERA.

[4]While this case was pending before PERB, PNHA became defunct. However, the local housestaff associations which had been affiliated with PNHA continued to function on a local level for purposes which included representation of housestaff in employment relations with the University. The associations then formed a new systemwide organization, the California Association of Interns and Residents (CAIR), which now functions as the umbrella organization for housestaff associations in the University system. On January 14, 1985, CAIR moved for an order substituting it as the real party in interest in place of PNHA, on the ground that CAIR is its successor in interest. The University did not oppose the motion, and this court granted it on April 4, 1985.

[5]The evidence is discussed in greater detail in Part III of this opinion.

degree. To qualify to practice medicine in California and in most other states, such an individual must complete at least one year in an approved residency program. In California, he or she must also obtain a "physician's and surgeon's certificate" from the Board of Medical Quality Assurance. Until receipt of such a certificate, housestaff may practice medicine only under an approved residency program. (Bus. & Prof. Code, § 2065.)

Most residency programs take between two and six years to complete, depending upon the specialty. The programs are structured so that housestaff rotate through different hospital services relevant to their specialty. Upon successful completion of a residency, an individual receives a certificate entitling him or her to take a specialty board examination leading to board certification in a particular specialty. Board certification is not a requirement for specialty practice, but attests to the physician's competence in that field.

Board certification requires participation in a training program approved by the Liaison Committee on Graduate Medical Education (LCGME). LCGME sets standards for residency programs, reviews programs for compliance and grants accreditation to programs which meet those standards. In order for University residency programs to acquire LCGME approval, they must comply with the general requirements contained in an LCGME document entitled "Essentials of Accredited Residencies."

On April 9, 1980, the PERB hearing officer concluded that housestaff are not employees under HEERA and recommended that PNHA's unfair labor practice charge be dismissed.

PNHA filed exceptions to the proposed decision. On February 14, 1983, PERB rendered a written decision adopting the hearing officer's findings of facts and making additional factual findings. The Board found that the educational objectives were subordinate to the services housestaff perform and coverage of housestaff under HEERA would further the purposes of the Act. Based on these findings, the Board concluded that housestaff are "employees." It further held that the University had violated HEERA by refusing to make payroll deductions. The Board issued a cease and desist order and directed the University to reimburse PNHA for the dues lost during the period for which the University made no payroll deductions.

This matter is before the court on the University's petition for a writ of review.

## II.

The first question to be resolved is whether HEERA precludes housestaff from being considered employees under the Act.

■ "'The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citations.]'" (*T. M. Cobb Co.* v. *Superior Court* (1984) 36 Cal.3d 273, 277 [204 Cal.Rptr. 143, 682 P.2d 338].) In determining such intent, the court turns first to the words of the statute. (*Ibid.*) "[W]here . . . the language is clear, there can be no room for interpretation." (*Caminetti* v. *Pac. Mutual L. Ins. Co.* (1943) 22 Cal.2d 344, 353-354 [139 P.2d 908].)

■ The statute provides in relevant part that "[t]he board may find student employees whose employment is contingent on their status as students are employees only if the services they provide are unrelated to their educational objectives, or, that those educational objectives are subordinate to the services they perform and that coverage under this chapter would further the purposes of this chapter." (§ 3562, subd. (f).)

Although the statute is silent on the subject of housestaff, it clearly leaves open the possibility that such persons may come within it. As the words of the statute make clear, the Legislature intended that PERB determine whether a particular student qualifies as an employee under the Act.

The legislative history which accompanied the passage of HEERA supports this conclusion. HEERA was enacted by Assembly Bill No. 1091 during the 1977-1978 session. When that bill was first introduced, subdivision (f) contained no reference to students. That provision simply defined "employees" as "any employee" except managerial and confidential employees. (Assem. Bill No. 1091 (1977-1978 Reg. Sess.) Mar. 24, 1977.) This section was subsequently amended to exclude "managerial, and confidential employees, and employees who are students on the same campus where they are employed and who work less than 10 hours per week." (Assem. Amend. to Assem. Bill No. 1091 (1977-1978 Reg. Sess.) May 23, 1977.)

However, the bill was not passed in this form. On the Senate side, an amendment was passed which eliminated the distinction between student employees based on the number of hours worked. That amendment, which was enacted into law, prescribed a case-by-case assessment of the degree to which a student's employment is related to his or her educational objectives. The determination of student employee status was expressly left to PERB. (Sen. Amend. to Assem. Bill No. 1091 (1977-1978 Reg. Sess.) Aug. 7, 1978.) Although this amendment arguably made the status of housestaff more uncertain, it is clear that they were not eliminated from coverage under the Act.

When this statutory history is considered in conjunction with a Legislative Counsel's opinion prepared while the bill was pending, the conclusion is inescapable that the Legislature did not intend to exclude housestaff from coverage under the Act. The Legislative Counsel's opinion was prepared at a time when subdivision (f) contained the exclusion for students employed less than 10 hours per week. The opinion concluded that "[w]hile this [exclusion] indicates an intention to cover students who are employees under some circumstances, it does not resolve the essential issue imposed by the [NLRB] as determining the coverage of student employees." (Ops. Cal.Legis. Counsel, No. 7522 (May 28, 1978) Housestaff Physicians, p. 3.) The opinion also noted that "[g]enerally speaking, the provisions of A.B. 1091 parallel those of the National Labor Relations Act [NLRA], as amended (Sec. 151 et seq., Title 29, U.S.C.). The [NLRB] . . . has concluded that interns and residents are 'primarily students' rather than 'employees' and thus are not covered by the National Labor Relations Act (St. Clare's Hospital [(1977) 229 NLRB 1000 [95 LRRM 1180]]; and Cedars-Sinai Medical Center [(1976) 223 NLRB 251 [91 LRRM 1398]]). . . . [¶] *We think that in the absence of any more definitive statements in A.B. 1091, the courts would conclude that a similar construction is intended under A.B. 1091* to that given the provisions of the National Labor Relations Act . . . ." (Ops.Cal.Legis. Counsel, No. 7522, *supra,* at p. 2, italics added.)[6]

---

[6]The Legislative Counsel's opinion continued: "In this connection, however, it should be noted that A.B. 1091 in its definition of 'employee' specifically excludes employees who are students on the same campus where they are employed and who work less than 10 hours per week, thus implying that employees who are students on the same campus where they are employed and work more than 10 hours per week are employees under the bill.

"While this indicates an intention to cover students who are employees under some circumstances, it does not resolve the essential issue imposed by the [NLRB] as determining the coverage of student employees. The board in the *St. Clare's Hospital* case, *supra,* stated as follows: [¶] 'Since the individuals are rendering services which are directly related to—and indeed constitute an integral part of—their education program, they are serving primarily as students and not primarily as employees. In our view this is a very fundamental distinction for it means that the mutual interests of the students and the educational institution in the services being rendered are predominantly academic rather than economic in nature. Such interests are completely foreign to the normal employment relationship, and in our judgment, are not readily adaptable to the collective-bargaining process. It is for this reason that the board has determined that national labor policy does not require—and in fact precludes—the extension of collective-bargaining rights and obligations to situations such as the one now before us.' [Citation.]

"Thus the inclusion of students as employees without making any distinction between those employed merely for economic reasons and those employed as a part of their educational program does not resolve the question concerning the status of interns and residents and, in construing A.B. 1091, we think it more probable that the courts would follow the construction given similar provisions of the National Labor Relations Act.

"In conclusion it is our opinion that A.B. 1091 would not include housestaff physicians within the meaning of the term employees." (Ops.Cal.Legis. Counsel, No. 7522, *supra,* pp. 3-4.)

The Legislature responded to this opinion by amending subdivision (f) to *include* a "more definitive statement" as to the status of student employees. That action strongly suggests that the Legislature intended to promulgate a new standard for determining this issue rather than to follow NLRB precedent and deny housestaff employee status.[7] That action also indicates that the Legislature did not intend to foreclose the issue of housestaff organizational rights. Instead, its creation of a statutory standard distinct from NLRB precedent was intended to permit PERB to make an independent determination of the status of housestaff.

The dissent contends that the Legislature's amendment was intended to incorporate NLRB precedent into the Act and deny housestaff employee status. This argument requires a comparison of the NLRB precedent with the statutory language ultimately adopted.

The NLRB first addressed the issue of housestaff status in *Cedars-Sinai Medical Center* (1976) 223 NLRB 251 [91 LRRM 1398]. Over a strong dissent, the NLRB held that housestaff were not employees under the NLRA, since they "are primarily engaged in graduate educational training" and thus are in "an educational rather than an employment relationship [with the hospital]." (*Id.,* at p. 1400 [223 NLRB at p. 253].)

In arriving at that determination, the NLRB focused primarily on the purpose of housestaff participation in such programs. The Board paid little attention to the actual services performed by them. It found that housestaff participate in such programs to gain an education, not to earn a living, and that their selection of programs is primarily motivated by the quality of the training they will receive, rather than the amount of compensation. Further, it noted that while housestaff do perform much unsupervised patient care, this is merely a part of the training they must receive to develop practical skills. (*Id.,* at p. 1400 [223 NLRB at p. 253].)[8]

---

[7]Amicus AFL-CIO also argue that certain letters written by and to Assemblyman Berman, the sponsor of Assembly Bill No. 1091, support this conclusion. This court may not consider those letters in determining legislative intent, as they simply reflect the motives and understandings of individual legislators. (See *San Mateo City School Dist.* v. *Public Employment Relations Bd.* (1983) 33 Cal.3d 850, 863 [191 Cal.Rptr. 800, 663 P.2d 523].)

[8]The Board summarized its findings as follows: "[Housestaff] participate in these programs not for the purpose of earning a living; instead they are there to pursue the graduate medical education that is a requirement for the practice of medicine. . . . While the housestaff spends a great percentage of their time in direct patient care, this is simply the means by which their learning process is carried out. It is only through direct involvement with patients that the graduate medical student is able to acquire the necessary diagnostic skills and experience to practice his profession. The number of hours worked or the quality of care rendered to the patients does not result in any change in monetary compensation paid to the housestaff members. The stipend remains fixed and it seems clear that the payments

Member Fanning vigorously dissented from the majority's approach. He argued that the fact that "hospitals are instructed to view the primary purpose of housestaff programs as educational has no bearing on whether the housestaff ultimately *performs a service for compensation . . . .*" (*Cedars-Sinai, supra,* 91 LRRM at p. 1403 [223 NLRB at p. 256].) Nor did Fanning find any relevance in "the fact that an individual desirous of becoming an orthopedic surgeon chooses a residency program based on its quality and the opportunity for extensive training." (*Id.,* at p. 1404 [223 NLRB at p. 257].) "That is," Fanning observed, "not a unique approach in any field of endeavor, particularly professional ones." (*Ibid.*) Instead, Fanning thought the Board's inquiry should focus on the services *actually performed* by housestaff.[9]

Member Fanning was not alone in his criticism of his colleagues' ruling. (See, e.g., Drake, *Labor Problems of Interns and Residents: The Aftermath of Cedars-Sinai* (1977) 11 U.S.F. L.Rev. 694; Maute, *Student-Workers or Working Students? A Fatal Question for Collective Bargaining of Hospital House Staff* (1977) 38 U.Pitt. L.Rev. 762, 767, 772, 786 [hereafter *Student-Workers or Working Students*]; see generally *Scholars or Working Stiffs,*

---

are more in the nature of a living allowance than compensation for services rendered. Nor does it appear that those applying for such programs attached any great significance to the amount of the stipend. Rather their choice was based on the quality of the educational program and the opportunity for an extensive training experience. The programs themselves were designed not for the purpose of meeting the hospital's staffing requirements, but rather to allow the student to develop in a hospital setting, the clinical judgment and proficiency in clinical skills necessary to the practice of medicine in the area of his choice. The 'Essentials,' which describe the standard for approved internships and residencies, indicate that the primary function is educational. Moreover, the tenure of the housestaff member at Cedars-Sinai is closely related to the length of the student's training program; thus few interns, residents, or clinical fellows can expect to, or do, remain to establish an employment relationship with Cedars-Sinai following the completion of their programs." (*Id.,* at p. 1400 [223 NLRB at p. 253].)

[9]Among the factors Fanning found relevant were that (1) housestaff perform many services without supervision; (2) they work long shifts when their "teachers" are not present; (3) the hospital charges fees for the services they perform; (4) Federal taxes are withheld from their pay; (5) they get sick leave, vacation pay, etc.; (6) the hospital is vicariously liable for their actions; and (7) they receive "*no* degree, *no* grades, [and] *no* examinations" for their services. (*Id.,* at pp. 1402-1403.)

From the patient's perspective, Fanning noted, the primary interest is undoubtedly the services performed—not the educational value of them. Furthermore, the hospital is able to provide "'competent medical care regular[ly,] routinely, or in emergencies as often as [needed]. *This would not be possible without either an adequate number of interns and residents or a very large staff of full-time physicians. The present intern and resident system . . . gives hospitals and attending physicians a way to maintain a constant stand-by physician services for all hospital patients. And the overall costs of this standby care are considerably lower than would be otherwise possible.*'" (*Id.,* at p. 1403, fn. 18, quoting Carroll, Program Cost Estimating in a Teaching Hospital (1969) at p. 76.)

*supra,* 12 Pacific L.J. 1127.)[10] Other jurisdictions chose not to follow the *Cedars-Sinai* majority. (See, e.g., *House Officers, etc.* v. *U. of Neb. Med. Ctr.* (1977) 198 Neb. 697 [255 N.W.2d 258, 261-262]; *City of Cambridge and Cambridge Hospital House Officers Association* (1976) 2 MLC 1450, 1458-1459 (Mass. Labor Cases).)

One year after *Cedars-Sinai* was decided, the NLRB addressed the issue again in *St. Clare's* (1977) 229 NLRB 1000 [95 LRRM 1180], noting that it "may not have been as precise as [it] might have been in articulating [its] views" in *Cedars-Sinai.* (95 LRRM at p. 1181 [229 NLRB at p. 1000], fn. omitted.)[11]

In these decisions the Board basically adopted a "primary purpose" test, which gave paramount consideration to the students' subjective intent in participating in housestaff programs. *"Our conclusion that housestaff are 'primarily students' rather than employees connotes nothing more than the simple fact that* when an individual is providing services at the educational institution itself as part and parcel of his or her educational development *the individual's interest in rendering such services is more academic than economic."* (*St. Clare's, supra,* 95 LRRM, at p. 1184 [229 NLRB at p. 1003], italics added.)

In *St. Clare's,* the NLRB also observed that *Cedars-Sinai* fit within its prior decisions which had classified students into four general categories. (95 LRRM at p. 1181 [229 NLRB at p. 1000].) Two of these categories concern commercial employers and are inapplicable here. The other two categories involved students employed by their own educational institutions either (1) in a capacity *unrelated* to their course of study (*id.,* at p. 1182

[10]Despite the contrary implication of our dissenting colleague (see *post,* at pp. 642-644), the citation of these secondary authorities is not intended to suggest that this court adopts the position taken by their authors. In fact, in holding that HEERA requires PERB to consider the motivation of housestaff in selecting a program (see *post,* at p. 614), this court explicitly rejects the commentators' contrary position. Thus, while the dissent's extensive critique of these authorities is interesting, if it is intended as criticism of our position, it is misplaced.

[11]*St. Clare's* was the second "clarification" of the *Cedars-Sinai* ruling. The NLRB had earlier reissued an opinion in *Kansas City General Hospital & Medical Center* (1976) 225 NLRB 108 [93 LRRM 1362], which it modified to conform to its ruling in *Cedars-Sinai.* Originally, *Kansas City* had stated in dictum that hospitals were not "employers" under the NLRA. Since that ruling had led one state court to conclude that state regulation of private hospitals was not preempted by federal labor law, the NLRB changed its position in the subsequent *Kansas City* ruling. Relying on the logic of *Cedars-Sinai,* the NLRB held that hospitals are indeed "employers" under the NLRA—subject to federal regulation and preempting local regulation—even though housestaff are not "employees." Thus, the NLRB concluded, hospitals and housestaff are within the reach of national labor policy, but "to extend to [housestaff] collective-bargaining rights would be contrary to that very policy." (93 LRRM at p. 1364 [225 NLRB at p. 109].)

[229 NLRB at p. 1001]), or (2) in a capacity *directly related* to their educational program (*id.,* at p. 1183 [229 NLRB at p. 1002]). Both of these categories of students are denied collective bargaining rights. (*Id.,* at pp. 1182-1183 [229 NLRB at p. 1002].)

After reviewing the various categories of students and noting that housestaff fall within the latter category, the NLRB reaffirmed its conclusion that housestaff are not entitled to collective bargaining rights under the NLRA. "Since the individuals are rendering services which are directly related to—and indeed constitute an integral part of—their educational program, they are serving primarily as students and not primarily as employees." (*St. Clare's, supra,* 95 LRRM at p. 1183 [229 NLRB at p. 1002], fn. omitted.)[12]

It is true, as the University notes, that subdivision (f) uses the "related/unrelated" classification scheme that *St. Clare's* created. However, that is where any similarity between *St. Clare's* and the present statute ends. While *St. Clare's* held that both categories of students were per se, *not entitled* to collective bargaining rights under the NLRA, HEERA *expressly* permits PERB to find students in both categories *entitled* to collective bargaining rights in appropriate circumstances.

Under HEERA, the Board may find students who are employed in a capacity *unrelated* to their course of study to be "employees" within the meaning of the Act and therefore entitled to collective bargaining rights. Further, PERB may find students who are employed in a capacity *related* to their educational program entitled to such rights depending on a case-by-case evaluation of (1) whether their educational objectives are subordinate to the services they perform, and (2) whether coverage under HEERA would further the purposes of the Act.

Thus, in defining "employees" under HEERA, the Legislature specifically rejected the NLRB rulings. Under the NLRB precedent, the relevant

---

[12]As the NLRB explained, "The rationale for dismissing such petitions [as this] is a relatively simple and straightforward one. Since the individuals are rendering services which are directly related to—and indeed constitute an integral part of—their educational program, they are serving primarily as students and not primarily as employees. In our view this is a very fundamental distinction for it means that the mutual interests of the students and the educational institution in the services being rendered are predominantly academic rather than economic in nature. Such interests are completely foreign to the normal employment relationship and, in our judgment, are not readily adaptable to the collective-bargaining process. It is for this reason that the Board has determined that the national labor policy does not require—and in fact precludes—the extension of collective-bargaining rights and obligations to situations such as the one now before us." (*St. Clare's, supra,* 95 LRRM at p. 1183 [229 NLRB at p. 1002], fn. omitted.)

inquiry is whether the student's objectives are primarily academic. Under HEERA, even if PERB finds that housestaff are motivated by "educational objectives," it may nevertheless classify them as "employees" if their objectives are "subordinate to the services they perform" and if granting collective bargaining rights would further the purposes of the Act. It is, therefore, clear that instead of denying collective bargaining rights to student employees of public educational institutions, the Legislature intended to permit PERB to grant such rights in situations not permitted under NLRB precedent. If, as the dissent suggests, the Legislature had intended to retain NLRB precedent, it could have easily done so by adopting the language of the NLRA verbatim.

The dissent attempts to recast the language of subdivision (f) in order to read it as *incorporating* the NLRB decisions. With all due respect, this attempt fails.

The crux of the dissent's position focuses on "10 rather colorless words" of subdivision (f) (dis. opn., *post,* at p. 641), which comprise the standard which PERB must apply in determining whether housestaff may be granted collective bargaining rights. Those 10 words declare that students may be classified as "employees" if "those educational objectives are subordinate to the services they perform . . . ." The dissent argues that those 10 words can be reduced to 2—"primary purpose." (Dis. opn., *post,* at p. 641.)

The dissent is correct in noting that when the statute refers to "*those* educational objectives" it means *the student's* educational objectives. This meaning becomes clear when the phrase is read in context with the passage immediately preceding it, which states that PERB may find that "student employees . . . are employees . . . if the services *they* provide are unrelated to *their* educational objectives . . . ." (Italics added.)

However, the dissent's analysis of the phrase immediately following this one is severely flawed. The dissent argues that the clause "are subordinate to the services they perform" means the student's *interest* in performing those services must be greater than his or her interest in obtaining an education. (Dis. opn., *post,* at p. 640.) Under this view, in order to qualify as an "employee" under HEERA, a student's "interest" in performing services must outweigh his or her interest in obtaining an education.

Such an interpretation is improper because it attempts to judicially redraft the Legislature's language. Surely, this court is not free to rewrite a statute merely because the Legislature has used what some members of the court

think are "10 rather colorless words." (Cf. *People* v. *Weidert* (1985) 39 Cal.3d 836, 847 [218 Cal.Rptr. 57, 705 P.2d 380].)

This interpretation, moreover, is not what the Legislature intended. Subdivision (f) makes clear that PERB should determine in each case whether "[the student's] educational objectives are subordinate to the services they perform."

The dissent argues that this language cannot be applied as written because it would require PERB to "'balance' apples and oranges." (Dis. opn., *post,* at p. 639.) That is to say, a student's "subjective" educational objectives cannot be "balanced" against the "objective" "services they perform." From this premise, the dissent takes a gargantuan leap and concludes that PERB may look only to the students' subjective balancing as to which aspect of the students' job *they* believe is more important. (Dis. opn., *post,* at p. 640.) The dissent then takes another leap and states that the *University's* subjective balancing of these factors is also a determinative factor. (*Ibid.*) The dissent cites absolutely no authority for this latter proposition.

While applying the Legislature's command may be difficult, that is no excuse for disregarding it altogether. The Legislature has clearly *not* instructed PERB to confine its inquiry to the students' state of mind. Moreover, nothing in the language of subdivision (f) even *hints* that the *University's* subjective perceptions of the functions of housestaff duties should be taken into consideration.

The Legislature has instructed PERB to look not only at the students' goals, but also at the services they actually perform, to see if the students' educational objectives, however personally important, are nonetheless subordinate to the services they are required to perform. Thus, even if PERB finds that the students' motivation for accepting employment was primarily educational, the inquiry does not end here. PERB must look further—to the services actually performed—to determine whether the students' educational objectives take a back seat to their service obligations.[13]

This interpretation is the only one which remains true to the statutory language. Moreover, it makes sense in light of the events surrounding the

---

[13]The dissent's view as to PERB's proper role in this case is perplexing. The dissent would have the court read HEERA as requiring PERB to reach a "preordained result" on the housestaff issue. (Dis. opn., *post,* at p. 634.) Thus, under the dissent's view, this issue would seem to be purely one of law and PERB would have no duty to resolve any factual inquiry into the nature of what housestaff actually do. However, the dissent later claims that PERB should actually determine whether housestaff's "educational objectives are subordinate to the services they perform." (Dis. opn., *post,* at p. 639.) It is not clear what purpose could be served by this factual inquiry if the result is truly "preordained."

passage of HEERA. As noted above, the housestaff issue was clearly on the mind of the Legislature when it enacted this provision. The NLRB had just rendered two controversial decisions on the issue. In those decisions a majority of the Board concentrated primarily on the students' motivation for entering into housestaff programs. The NLRB dissenter thought the focus should be confined to the services they actually perform, disregarding as irrelevant their motive for taking such jobs. (See *ante,* at pp. 609-611.)

Subdivision (f), as enacted, represents a compromise between the majority and dissenting opinions expressed in the NLRB decisions. HEERA took a middle road, requiring both factors to be considered. It is not the prerogative of this court to act as a super-legislature and alter that legislative choice merely because it may be unwise. (*People* v. *Dillon* (1983) 34 Cal.3d 441, 463 [194 Cal.Rptr. 390, 668 P.2d 697].)

Another provision of HEERA corroborates the conclusion that housestaff were not excluded, per se, from the benefits of collective bargaining. Section 3562, subdivision (o)(1) defines a "professional employee" as a person engaged in work (i) predominantly intellectual and varied in character, (ii) involving the consistent exercise of discretion, (iii) impossible to standardize with respect to output, and (iv) requiring knowledge of an advanced type acquired through a course of specialized intellectual instruction and study in an institution of higher learning or a hospital. A professional employee is also defined as an individual who has completed the courses of specialized intellectual instruction and study described in clause (iv) above and is performing related work under the supervision of a professional person to qualify to become a professional employee. (§ 3562, subd. (o)(2).) Housestaff fit precisely within this definition. The fact that housestaff so clearly fall within the definition of professional employee reinforces the view that the Legislature did not intend housestaff to be excluded under the Act.[14]

---

[14]The dissent argues that since the language of subdivision (o) in HEERA is essentially identical to the language of the NLRA (see 29 U.S.C. § 152(12)), the NLRB's rejection of similar arguments under that provision is dispositive of the issue here. (Dis. opn., *post,* at pp. 645-647.) But NLRB decisions—even if judicially upheld (see dis. opn., *post,* at p. 647)—are not binding upon PERB, especially in this context.

*Cedars-Sinai*'s holding that housestaff are not "professional employees" under NLRA section 2(12) was specifically linked to a NLRB finding that housestaff were not "employees" generally under section 2(3). In fact, the Board's analysis of the issue consisted of no more than a one-sentence conclusory footnote to its opinion: "As we have found, for the reasons stated above, [housestaff] are not employees within the meaning of the Act, we find no merit in Petitioner's contention that they are employees based on Sec. 2(11) and (12) of the Act, which defines the terms 'supervisor' and 'professional employee' respectively." (91 LRRM at p. 1400, fn. 4.) As noted above, under HEERA, whether housestaff are "employees" generally is not so clear, and PERB has determined that they are. Since that determination is a plausible one, the logic of the NLRB decisions, even if applicable, would *support* the conclusion that they are "professional employees" as well.

It is noteworthy that at the time HEERA was enacted the vast majority of decisions from other jurisdictions had concluded that housestaff are employees within the meaning of their respective collective bargaining statutes. (See, e.g., *House Officers, etc.* v. *U. of Neb. Med. Ctr., supra,* 255 N.W.2d 258; *Regents of Univ. of Mich.* v. *Michigan Emp. Rel. Com'n* (1973) 389 Mich. 96 [204 N.W.2d 218, 224] (hereafter *Regents-Michigan*); *City of Cambridge and Cambridge Hospital House Officers Association, supra,* 2 MLC 1450, 1463; *Wyckoff Heights Hospital* (1971) 34 SLRB 625, 631 (New York State Labor Relations Board); *Bronx Eye Infirmary, Inc.* (1970) 33 SLRB 245, 250; *The Long Island College Hospital* (1970) 33 SLRB 161, 172-173; *Brooklyn Eye and Ear Hospital* (1969) 32 SLRB 65, 74; see also *Albert Einstein College, Etc.* (1970) 33 SLRB 465, 467; but see *Pa. Ass'n of Int. & Res.* v. *Albert Einstein Med. Ctr.* (1977) 470 Pa. 562 [369 A.2d 711, 714].)[15] Although these collective bargaining statutes did not contain a provision like subdivision (f), many of the factors which led to the conclusion that housestaff are employees are similar to those which are appropriately considered under a subdivision (f) analysis.[16]

---

[15]The reasoning of *Regents-Michigan, supra,* 204 N.W.2d 218, is illustrative. There, a group of interns and residents organized an association and attempted to bargain with University of Michigan Hospital administrators. When the hospital refused to bargain, the association filed a petition for representation with the Michigan Employment Relations Commission (MERC). MERC found that housestaff were employees under the Michigan Public Employees Relations Act (PERA).

The Michigan Supreme Court affirmed MERC's finding. (204 N.W.2d at p. 224.) The court noted that PERA created only one exception from its coverage for classified civil service workers. "If the Legislature had intended to exclude students/employees from the operation of PERA, they could have written such an exception into the law." (*Id.,* at p. 225.)

The court relied on the following factors: (1) a portion of housestaff's compensation is withheld for the purposes of federal and state income tax and social security coverage; (2) housestaff receive fringe benefits, including health coverage; (3) compensation is paid by university checks drawn from a university account; (4) housestaff spend over three-quarters of their time providing patient care services; and (5) housestaff are entrusted with many responsibilities that medical students are not, including writing of prescriptions, running outpatient clinics, admitting and discharging patients and performing operations and surgical techniques under little or no supervision. (204 N.W.2d at p. 225.)

The court concluded that "[i]nterns, residents and postdoctoral fellows are both students and employees. The fact that they are continually acquiring new skills does not detract from the findings of the MERC that they may organize as employees under the provisions of PERA. Members of all professions continue their learning throughout their careers. For example, fledgling lawyers employed by a law firm spend a great deal of time acquiring new skills, yet no one would contend that they are not employees of the law firm." (204 N.W.2d at p. 226.)

[16]For example, many of the cases cited considered such factors as: the kinds of services housestaff must perform; the amount of time spent performing such services compared to the time spent in formal instruction; the performance of such services without supervision; the obligation to accept assignments regardless of their educational value; the fact that hospitals bill for services provided by housestaff; the inability of hospitals to provide the same level of care without housestaff labor; the manner in which housestaff are compensated; and

In view of the foregoing, it is clear that the Legislature did not intend to preclude housestaff from coverage under the Act. Rather, it left that determination to PERB. Under subdivision (f), the Board determines whether students are employees under the Act by assessing whether the educational objectives are subordinate to the services students perform and whether according them collective bargaining rights would further the purposes of the Act. Since PERB made such a finding here, the only remaining issue is whether there is substantial evidence to support it.

### III.

"[T]he relationship of a reviewing court to an agency such as PERB . . . is generally one of deference." (*Oakland Unified School Dist.* v. *Public Employment Relations Bd.* (1981) 120 Cal.App.3d 1007, 1012 [175 Cal.Rptr. 105], citing *Ford Motor Co.* v. *NLRB* (1979) 441 U.S. 488, 495 [60 L.Ed.2d 420, 426, 99 S.Ct. 1842]; accord *Moreno Valley Unified School Dist.* v. *Public Employment Relations Bd.* (1983) 142 Cal.App.3d 191, 196 [191 Cal.Rptr. 60].) Such deference is mandated by HEERA itself. "The findings of the board with respect to questions of fact, including ultimate facts, if supported by substantial evidence on the record considered as a whole, are conclusive." (§ 3564, subd. (c).)

This court recently reaffirmed the limited nature of judicial review of a labor board's determinations under the substantial evidence standard. "Of course, we do not reweigh the evidence. If there is a plausible basis for the Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so. [Citations.] We will uphold the Board's decision if it is supported by substantial evidence on the whole record. [Citations.]" (*Rivcom Corp.* v. *Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 756-757 [195 Cal.Rptr. 651, 670 P.2d 305], cert. den. (1984) 466 U.S. 972 [80 L.Ed.2d 819, 104 S.Ct. 2345]; see also *San Diego Teachers Assn.* v. *Superior Court* (1979) 24 Cal.3d 1, 12 [154 Cal.Rptr. 893, 593 P.2d 838]; *Moreno Valley Unified School Dist.* v. *Public Employment Relations Bd., supra,* 142 Cal.App.3d at p. 196.)

Under the substantial evidence standard, when a labor board chooses between two conflicting views, a reviewing court may not substitute its judgment for that of the Board. As the United States Supreme Court has observed, "To be sure, the requirement for canvassing 'the whole record' in

the treatment of such compensation under tax laws. (See, e.g., *House Officers, etc., supra,* 255 N.W.2d at pp. 260-262; *City of Cambridge, supra,* 2 MLC at pp. 1453-1463; *Brooklyn Eye and Ear Hospital, supra,* 32 SLRB at pp. 68-73; *Long Island College Hospital, supra,* 33 SLRB at pp. 165-170; *Bronx Eye Infirmary, Inc., supra,* 33 SLRB at pp. 247-249.)

order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" (*Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 488 [95 L.Ed. 456, 467-468, 71 S.Ct. 456].)

██ PERB's review of the evidence revealed that the patient care services performed by housestaff were an important part of the hospital's overall service delivery. The Board also found that although housestaff did receive educational benefits in the course of their programs, this aspect was subordinate to the services they performed. The Board made this determination based on (1) the substantial quantity of time housestaff spend on clinical activities and direct patient care, (2) the nature of the procedures housestaff perform with little or no supervision, (3) the professional guidance they provide for interns, medical students and other hospital employees such as nurses and technicians, (4) the extensive indicia of employment that characterize housestaff as employees rather than students, and (5) the extent of the educational benefit and training received by housestaff. A review of the record demonstrates that the Board's finding was supported by substantial evidence.

There was abundant testimony that housestaff provide valuable patient-care services. From their first year of residency, housestaff are immersed in all aspects of direct patient care. They perform physical examinations, obtain patients' medical histories, develop treatment plans, prescribe drugs, administer dangerous drugs which nurses are not permitted to administer, and perform various operations and procedures. First-year residents normally write all orders for patient treatment and prescriptions. Housestaff are also required to supervise other hospital personnel such as nurses and technicians.

Some of the procedures performed by housestaff—in most cases with no attending physician present—include bone marrow biopsies, intubation, running of respirators, drawing blood, cardiopulmonary resuscitation, administering barium enemas, upper GI's (evaluations of the intestinal tract), IVP's (evaluations of the urinary tract), bone marrow aspirations, and placement of catheters. Also, housestaff perform procedures in life-threatening

situations without the presence of attending physicians, including open chest massage and placement of pacemakers and chest tubes.

Housestaff also deliver babies. They are often called upon to perform Caesarean sections, forcep deliveries and emergency D and C's (dilation and curettage). In many instances, these procedures are performed in the absence of an attending physician.[17]

Residents are also assigned to outpatient clinics where they treat patients with minor problems and admit patients who require more extensive treatment to the hospital. Attending physicians are rarely consulted in these matters.

In the course of providing direct patient care, entry-level residents are supervised by more senior housestaff who generally operate with little or no supervision. In general, a resident is given as much independent patient-care responsibility as he or she is able to handle. In some cases, a patient may be admitted and discharged from the hospital without ever seeing an attending physician. Housestaff are generally the sole physicians providing nighttime care when many emergency medical situations arise since attending physicians are rarely in the hospital at night.

Housestaff also work very long hours. An 80- or 100-hour week is not uncommon. More than 75 percent of that time is usually spent in direct patient care.

The remaining time is spent in didactic, or instructional, activities. These activities consist of lectures, weekly "grand rounds" during which cases are discussed with faculty, and "attending rounds" during which housestaff visit patients with an attending physician or the chief resident. In some specialties, a portion of the resident's time is set aside for intensive classroom, instructional or research activity. Since patient care is their primary responsibility, it is not uncommon for housestaff to be absent from didactic activities.

The extensive indicia of employment status also weigh in favor of the Board's findings. Housestaff are paid with monthly payroll checks from

---

[17]One resident testified that no attending physician was present during 95 percent of the deliveries the resident performed. Another testified that during the three months she was on the obstetric-gynecology rotation she never saw an attending physician in the delivery room.

which federal and state income taxes are withheld.[18] In 1979, annual salaries ranged from $15,100 to $21,800. Housestaff receive annual step and cost of living increases. They complete personnel forms, signing as "employees."

Housestaff receive several fringe benefits including paid vacations and medical coverage. Their medical malpractice and workers' compensation insurance is paid for by the University. On the other hand, housestaff are not included in the University's retirement system and do not receive life insurance or state unemployment insurance benefits. However, these facts do not detract from other evidence which strongly indicates employee status.

In addition, most indicia of student status are lacking, an omission which provides further support for PERB's conclusion. Although housestaff are eligible for financial aid, they pay no tuition or student fees. They do not take University examinations. They receive no grades. They do not complete registration forms processed by the registrar's office. They receive no degrees after they have completed their residencies.

The "Essentials of Accredited Residencies" (hereafter Essentials), which set forth general requirements with which the University residency programs must comply (see *ante*, at p. 606), also support the Board's finding. Hospitals in which approved residency programs operate must be conducted "primarily for the welfare of the patient. . . . *[T]he educational program is supplementary to the primary purpose of the hospital, i.e., the care and management of patients . . . .*" (Italics added.)

The Essentials encourage hospitals to enter into contracts with residents for the purpose of determining salary, hours, working conditions and fringe

---

[18]Although section 117 of the Internal Revenue Code (26 U.S.C. § 117) provides that scholarships and fellowships can be excluded from gross income, in the overwhelming majority of cases, payments made to housestaff are considered compensation for services rendered and not within the section 117 exclusion. Thus, housestaff are treated as employees for tax purposes. (See, e.g., *Rockswold* v. *United States* (8th Cir. 1980) 620 F.2d 166; *Meek* v. *United States* (9th Cir. 1979) 608 F.2d 368; *Parr* v. *United States* (5th Cir. 1972) 469 F.2d 1156; *Hembree* v. *United States* (4th Cir. 1972) 464 F.2d 1262; *Rundell* v. *C.I.R.* (5th Cir. 1972) 455 F.2d 639; *Quast* v. *United States* (8th Cir. 1970) 428 F.2d 750; *Woddail* v. *C.I.R.* (10th Cir. 1963) 321 F.2d 721, 724 [As to the hospital-housestaff relationship, the United States Court of Appeals observed that "[i]t is difficult to imagine a more perfect example of an employer-employee relationship."]; *Burstein* v. *United States* (Ct. Cl. 1980) 622 F.2d 529; *Tobin* v. *United States* (S.D.Tex. 1971) 323 F.Supp. 239; *Kwass* v. *United States* (E.D.Mich. 1970) 319 F.Supp. 186; *Wertzberger* v. *United States* (W.D.Mo. 1970) 315 F.Supp. 34, affd. per curiam (8th Cir. 1971) 441 F.2d 1166; but see *Mizell* v. *United States* (8th Cir. 1981) 663 F.2d 772; cf. *Leathers* v. *United States* (8th Cir. 1972) 471 F.2d 856, cert. den. (1973) 412 U.S. 932 [37 L.Ed.2d 161, 93 S.Ct. 2754].)

benefits. "It is inappropriate that house officers be expected to assume increasing responsibility for patient care, while not at the same time participating effectively in communications which contribute ultimately to policy-making decisions. The intern and resident must be integrated into the medical staff as true colleagues in order that effective programs of medical education and patient care be carried out."[19] Since the University must comply with the Essentials to retain accreditation, these statements cannot be ignored.

The University argues that residency programs are primarily of an educational nature. It contends that (1) housestaff participate in the residency programs in order to further their educational development, (2) residency programs are developed by the various departments of the different medical schools to ensure that educational objectives predominate, (3) clinical service and the various tasks and duties required of housestaff are of an educational value, (4) the programs include participation in various didactics such as grand rounds, lectures and efforts to keep informed of the latest medical literature, and (5) clinic service is required by the Essentials.

The fact that housestaff obtain an educational benefit from providing direct patient-care services does not mean services are subordinate to educational objectives. Such services are undertaken for a patient's welfare. Obviously, patient demands are such that services must be performed without regard to whether they will provide any educational benefit.

Many services housestaff perform become routine and do not have a continuing educational value. That housestaff must continue to perform them supports PERB's conclusion that the "educational" side of the scale is subordinate to the "services" side.

Also, housestaff do not administer procedures on patients simply to "polish their skills." Rather, their day-to-day routine, like that of regular physicians, is dictated almost entirely by the exigencies of injury and disease. In short, although housestaff obviously receive intensive professional training through their work, there is substantial evidence to support the Board's finding that educational objectives are subordinate to the services they perform. In light of that substantial evidence, this court must defer to PERB.

The next step in determining whether housestaff are employees under subdivision (f) is to assess the Board's finding that granting collective bar-

---

[19]The Essentials also state that the primary purpose of a residency program is "professional education." This does not necessarily imply that services performed by housestaff are subordinate to educational objectives, since the Essentials also state that the educational program is "supplementary" to patient care.

gaining rights to housestaff would further the purposes of HEERA. This determination necessarily involves questions of fact and policy. It is also necessary to bear in mind PERB's expertise in this area.

In enacting HEERA, the Legislature found that the people of this state "have a fundamental interest in the development of harmonious and cooperative labor relations between the public institutions of higher education and their employees." (§ 3560, subd. (a).) The Legislature also found that it would be "advantageous and desirable" to grant collective bargaining rights to higher education employees. (See id., subd. (b).) As the Legislature declared, "[i]t is the purpose of this chapter to provide the means by which relations between each higher education employer and its employees may assure that the responsibilities and authorities granted to the separate institutions . . . are carried out in an atmosphere which permits the fullest participation by employees in the determination of conditions of employment which affect them." (Id., subd. (e).) "It is the further purpose of this chapter to provide orderly and clearly defined procedures for meeting and conferring and the resolution of impasses, and to define and prohibit certain practices which are inimical to the public interest." (§ 3561, subd. (a).)

The Board found and the record demonstrates that there are substantial employment concerns which affect housestaff, particularly in the area of wages, hours and working conditions. Salaries, vacation time, fringe benefits and hours are manifestly amenable to collective negotiations and have a direct and primary impact on the employment relationship of housestaff with the University. The Board concluded that according housestaff collective bargaining rights would further the purposes of the Act because it would enable them to participate fully in the determination of employment conditions which affect them. Further, the interest of developing "harmonious and cooperative labor relations" would be advanced since a viable mechanism for resolving their differences would be available.

PERB also suggested that denying housestaff collective bargaining rights would have serious ramifications in the public health care field.[20] In addition, PERB found that according collective bargaining rights to housestaff would provide a viable mechanism for resolving disputes and minimize the

---

[20]As one commentator has observed, "[h]ousestaff agitation for collective bargaining has coincided with their dissatisfaction over working conditions, and strikes over these matters have occurred with increasing frequency since the early 1970's. Since many of the hospitals involved [in the University's residency programs] are public, these strikes have a severe impact on that percentage of the population unable to afford treatment elsewhere. Thus, a PERB decision concerning housestaff coverage under HEERA will have repercussions beyond the group of approximately 4,500 UC housestaff and affect the community at large." (Scholars or Working Stiffs, supra, 12 Pacific L.J. at pp. 1144-1145, fns. omitted.)

potential for strikes.[21] Lastly, PERB recognized that the quality of patient care is no doubt affected by the conditions under which housestaff are required to render services, and that bargaining over such matters as hours and working conditions may result in higher quality health care.

Given PERB's expertise in this area and the reasonableness of its conclusions, deference to PERB's finding is warranted.

The University asserts that if collective bargaining rights were given to housestaff the University's educational mission would be undermined by requiring bargaining on subjects which are intrinsically tied to the educational aspects of the residency programs. This "doomsday cry" seems somewhat exaggerated in light of the fact that the University engaged in meet-and-confer sessions with employee organizations representing housestaff *prior* to the effective date of HEERA.[22]

Moreover, the University's argument is premature. The argument basically concerns the appropriate scope of representation under the Act. (See § 3562, subd. (q).) Such issues will undoubtedly arise in specific factual contexts in which one side wishes to bargain over a certain subject and the other side does not. These scope-of-representation issues may be resolved by the Board when they arise, since it alone has the responsibility "[t]o determine in disputed cases whether a particular item is within or without the scope of representation." (§ 3563, subd. (b).)

The University also argues that permitting collective bargaining for housestaff may lead to strikes. However, it is widely recognized that collective bargaining is an alternative dispute resolution mechanism which diminishes the probability that vital services will be interrupted. (See *San Diego Teachers Assn.* v. *Superior Court, supra,* 24 Cal.3d at pp. 8-9, 13.)

Finally, the University argues that the brief tenure of housestaff's relationship with the University undermines the conclusion that coverage would further the purposes of the Act. The University acknowledges that many other individuals whose relationship with the University is of short duration

---

[21]As one commentator has noted, "Disruptions [in the flow of essential public services] are minimized where workers providing essential services have an adequate system for resolving disagreements over wages, hours, or working conditions." (Comment, *Labor Law—Exclusion of Hospital Housestaff from Public Employee Collective Bargaining in Pennsylvania* (1977) 11 Suffolk U. L.Rev. 1172, 1185, fn. omitted.)

[22]In addition, housestaff organizations at Harbor General Hospital, a hospital affiliated with UCLA's program, have engaged in collective negotiations with the County of Los Angeles for several years.

have been accorded employee status with full bargaining rights. Housestaff should not be treated differently. As the record demonstrates, housestaff in certain residency programs may be employed by the University for up to six years.

Since there is substantial evidence to support the Board's finding that educational objectives are subordinate to the services performed by housestaff and granting collective bargaining rights to them will further the purposes of the Act, the Board's conclusion that housestaff are employees must be affirmed.[23]

## IV.

The HEERA does not preclude housestaff from being considered employees. The Legislature specifically intended that PERB determine whether students are employees under the Act by assessing whether the educational objectives are subordinate to the services students perform and whether according them collective bargaining rights would further the purposes of the Act. Here, the Board's determination to that effect is supported by substantial evidence. Therefore, the Board properly concluded that housestaff are employees under HEERA.

The Board's decision is affirmed. The matter is remanded to the Board for reconsideration of its remedy in light of the defunct status of PNHA. (See *ante,* fn. 4.)

Mosk, J., Broussard, J., and Reynoso, J., concurred.

**LUCAS, (Campbell), J.**\*—I respectfully but emphatically dissent. My review of the record convinces me that respondent Public Employment Relations Board (PERB) abused its discretion in this case, by failing to follow the governing statute, Government Code section 3562, subdivision (f) (hereafter subdivision (f)).[1] The majority opinion compounds this error by mischaracterizing the legislative history and plain meaning of subdivision

---

[23]The University also challenges many of PERB's specific factual findings. Those few which have merit in no way undermine the Board's ultimate finding that educational objectives are subordinate to the services housestaff perform.

\*Associate Justice, Court of Appeal, Second District, Division One, assigned by the Chairperson of the Judicial Council.

[1]In this opinion I use the same contractions as does the majority opinion to denote statutes, cases and law review articles cited therein.

I use the term "housestaff"—as does the majority opinion (*ante,* p. 604, fn. 1)—generally to denote the agglomeration of clinical fellows, residents, and unlicensed medical school graduates (interns) who collectively seek bargaining rights in this case.

(f), thereby improvidently converting this into a "substantial evidence" case when the basic issue actually is whether PERB even understood the Legislature's directive concerning the factual inquiry PERB was to pursue.

In effect, the majority and PERB have concluded that, rather than conducting a bona fide residency program, the University has established its program as a device for procuring a cheap source of skilled medical labor to work in its hospitals. That conclusion, of course, stands the whole idea of university teaching hospitals and residency programs on its head.

In the following portions of this opinion, I shall trace the origins of subdivision (f) and discuss what it really means, on its face. I shall show that the Legislature reacted to the problem of how to define "employees" for purposes of HEERA by adopting, in subdivision (f), a definitional provision that parallels that contained in the National Labor Relations Act but more fully specifies how PERB is to determine whether student employees of the University are entitled to collective bargaining. More particularly, I shall explain that when the Legislature confronted this issue in 1978, it faced, with respect to housestaff, two approaches to the problem, respectively reflected by the majority and dissenting opinions in the NLRB's *Cedars-Sinai* decision. The majority approach was to focus upon the undisputed primary purposes of housestaff in pursuing a residency program; the dissenting approach was to draw upon the undisputed responsibilities and indicia of employment that housestaff bear. The Legislature chose the NLRB majority approach, and fashioned subdivision (f) so as to well-nigh compel PERB to find housestaff not to be employees.

Somehow, PERB did not get the message. It pursued the same approach as the dissent in the *Cedars-Sinai* case, and focused upon indicia of employment, deeming it irrelevant that this case involved housestaff at *University* hospitals, maintained and operated for teaching purposes. The result is a decision that not only ignores the statutory language but also presents a picture of the University's housestaff program as untrue to its and its students' purposes.

While my opinion chiefly treats the fundamental statutory question, it concludes with an explanation of what I perceive to be the proper disposition of this case. That disposition is to issue a writ of mandate directing PERB to vacate its decision and issue a new decision applying the statute as the Legislature intended it.

I

THE NATIONAL BACKGROUND
STUDENTS OR EMPLOYEES? UNDISPUTED FACTS, FLEXIBLE LAW

An initial review of events outside of California is necessary to provide perspective for understanding the majority opinion's misperception of this case.

The question whether housestaff are entitled to collective bargaining rights was hotly contested in several jurisdictions before the enactment of HEERA in 1978. The battle, however, involved primarily questions of statutory interpretation and semantics, because the congeries of facts considered by various courts and labor boards were generally consistent if not fungible with each other and, for that matter, with the record in this case.

For example, in the two leading decisions holding housestaff "students" rather than "employees" and thereby denying them collective bargaining (*Cedars-Sinai Medical Center* (1976) 223 NLRB 251 [91 LRRM 1398] (hereafter *Cedars*) and *Pa. Ass'n of Int. & Res.* v. *Albert Einstein Med. Ctr.* (1976) 470 Pa. 562 [369 A.2d 711] (hereafter *Pennsylvania*)), the undisputed record disclosed that housestaff shared the same attributes and conditions that PERB here found dispositive—extensive time spent in clinical activities and direct patient care; performance of medical procedures with little or no "attending" supervision; guidance given to other housestaff, medical students, and hospital personnel; and "indicia of employment" such as stipends paid, workers' compensation insurance provided, and federal income tax withheld. (Compare *Cedars,* 223 NLRB at p. 252 (maj. opn.), and pp. 255-256 (dis. opn.), and *Pennsylvania,* 369 A.2d at p. 714, with maj. opn., *ante,* pp. 617-619.) Conversely, in the two leading decisions granting housestaff the right to bargain (*Regents of Univ. of Mich.* v. *Michigan Emp. Rel. Com'n* (1973) 389 Mich. 96 [204 N.W.2d 218] (hereafter *Michigan*) and *House Officers, etc.* v. *U. of Neb. Med. Ctr.* (1977) 198 Neb. 697 [255 N.W.2d 258] (hereafter *Nebraska*), the record included not only similar facts but also undisputed evidence of many of the elements upon which the University relies in the present case—most significantly, that housestaff's *purpose* in pursuing a residency program was educational and that the extensive and demanding patient care activities that dominated the program subserved an educational function. (Compare *Michigan,* 204 N.W.2d at pp. 225-226 and *Nebraska,* 255 N.W.2d at pp. 260-261 with maj. opn., *ante,* p. 621.)

The dispositive factor in these conflicting decisions thus was not the factual record developed concerning "the facts of housestaff life." These are

essentially universal, and all of the aforementioned cases concurred that housestaff, as a practical matter, are *both* students and employees. The cases holding in favor of collective bargaining expressly so stated,[2] and those holding to the contrary were forced to concede effectively as much.[3] Where the cases ultimately divided was in the emphasis the determining tribunal placed upon the "student" and "employee" factors in construing and applying the relevant statute.

Here too, the prior cases discussed above had something in common. In each jurisdiction, the determination whether collective bargaining would appertain revolved around application of a statute that granted such rights to "employees" without further defining what that term meant except in very broad and inclusive terms. The upshot of this statutory situation was that in Michigan and Nebraska, courts holding in favor of housestaff and against the universities had a relatively easy task in justifying their decisions as to employee status under the governing statutes. The majority opinion here has quoted the *Michigan* court's expression on the subject (*ante,* p. 614, fn. 13); the *Nebraska* court's reasoning was very similar.[4]

On the other hand, the *Pennsylvania* court, when faced with applying a statute that defined "public employee" as "any individual employed by a public employer" (see 369 A.2d at p. 714), divided four to three in favor of Temple University when it held that housestaff were not such employees. Like the NLRB in *Cedars,* the *Pennsylvania* majority conceded that housestaff possessed numerous "employee" attributes but focused upon housestaff's own *purpose* in serving as such, and concluded that since the young physicians and medical school graduates (interns) "at Temple University

---

[2]See *Michigan,* 204 N.W.2d at page 226 ("We do not regard these two categories as mutually exclusive. Interns, residents and post-doctoral fellows are both students and employees"); *Nebraska,* 255 N.W.2d at page 261 ("The obvious conclusion from the recitation of facts is that the House Officers are both students and employees of the University of Nebraska").

[3]In *Cedars* the NLRB summed up its holding as follows: ". . . we find that interns, residents, and clinical fellows, although they possess certain employee characteristics, are primarily students." (223 NLRB at p. 251.) Similarly, the majority in *Pennsylvania* said, "In our opinion, while appellants herein are clothed with the indicia of employee status, the true nature of their reason for being at Temple University negates their employee status." (369 A.2d at p. 714.)

[4]"Section 48-801, R.R.S.1943 states: 'Employee shall include any person employed by an employer as defined in sections 48-801 to 48-823.' The section provides the employer shall mean 'the State of Nebraska or any political or governmental subdivision of the State of Nebraska, except the Nebraska National Guard or state militia, any municipal corporation, or any public power district or public power and irrigation district.' We find nothing in the stated purpose of the act that would indicate that the Legislature intended that persons who are students but also employees of the University of Nebraska should be exempted from the provisions of the act." (255 N.W.2d at p. 262.)

[were] at Temple not for the primary purpose of obtaining monetary remuneration, but rather to fulfill educational requirements," they should not be considered employees under the enabling act. (369 A.2d at pp. 714-715.) This holding evoked vociferous dissents, not to the court's characterization of housestaff's purposes but rather to its reliance on them in interpreting and applying the statute. While conceding, at least arguendo, that housestaff's personal and professional purposes were educational, the dissenters deemed this irrelevant. In their view, the extensive indicia of employment to which the majority also had alluded should have been dispositive.[5]

The dissenting position in *Pennsylvania* paralleled that of dissenting NLRB Member Fanning in *Cedars*. (See maj. opn., *ante,* p. 610; see also *post,* pp. 641-642.) And the *Cedars* majority likewise employed a mode of analysis quite similar to that of the *Pennsylvania* court, which followed it. *Cedars,* however, deserves further discussion, for reasons that will soon become apparent.

The governing statute in *Cedars* was section 2(3) of the National Labor Relations Act (hereafter the NLRA or the Act), 29 United States Code section 152(3), which provides in relevant part that "The term 'employee' shall include any employee . . . unless this [Act] explicitly states otherwise . . .," and then proceeds to list some of the Act's few explicit exceptions. In short, as the Supreme Court has noted, "The Act provides broadly that 'employees' have organizational and other rights. 29 U.S.C. § 157. Section 2(3) defines 'employee' in general terms, 29 U.S.C. § 152(3) . . . ." (*NLRB* v. *Yeshiva University* (1980) 444 U.S. 672, 681, fn. 12 [63 L.Ed.2d 115, 125, 100 S.Ct. 856].)[6]

The exceptions listed in section 2(3) do not, on their face, include housestaff. In *Cedars,* the NLRB nonetheless found and held that housestaff were

---

[5]Justice Roberts' language is epitomic: "Plainly, the governing issue here is whether [housestaff] are employees not their reasons for obtaining such employment. Their reason for obtaining employment is an irrelevant consideration. Our task is not to create exceptions to the broad statutory definition of an 'employee' based on what are urged to be distinctions in employment motivation." (*Pennsylvania,* 369 A.2d at p. 722 (dis. opn.).)

[6]The complete text of section 2(3) is: "The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse, or any individual having the status of an independent contractor, or any individual employed as a supervisor, or any individual employed by an employer subject to the Railway Labor Act, as amended from time to time, or by any other person who is not an employer as herein defined."

not employees in the legal sense of the Act—principally because of the purpose of the residency program and the purpose of housestaff in participating in it. Those factors led the NLRB, in its own words, to "find that interns, residents and clinical fellows are primarily engaged in graduate educational training at Cedars-Sinai and that their status is therefore that of students rather than of employees." (223 NLRB at p. 253.) The NLRB's specific findings concerning the nature and purpose of the residency programs, and the purposes of housestaff in pursuing them, merit quotation here at length for purposes of further allusion later:

"The record shows that the medical education and training of a physician involves a progression from classroom and laboratory education in the basic and clinical sciences, through an internship, and usually then to a period of more advanced training in a specialty or subspecialty of medicine. It is the purpose of internship and residency programs to put into practice the principles of preventive medicine, diagnosis, therapy, and management of patients that the medical school graduate learned in medical school.

". . . . . . . . . . . . . . . . . . . . . . .

"From the foregoing and the entire record, we find that interns, residents, and clinical fellows are primarily engaged in graduate educational training at Cedars-Sinai and that their status is therefore that of students rather than of employees. They participate in these programs not for the purpose of earning a living; instead they are there to pursue the graduate medical education that is a requirement for the practice of medicine. An internship is a requirement for the examination for licensing. And residency and fellowship programs are necessary to qualify for certification in specialties and subspecialties. While the housestaff spends a great percentage of their time in direct patient care, this is simply the means by which the learning process is carried out. It is only through this direct involvement with patients that the graduate medical student is able to acquire the necessary diagnostic skills and experience to practice his profession. The number of hours worked or the quality of the care rendered to the patients does not result in any change in monetary compensation paid to the housestaff members. The stipend remains fixed and it seems clear that the payments are more in the nature of a living allowance than compensation for services rendered. Nor does it appear that those applying for such programs attached any great significance to the amount of the stipend. Rather their choice was based on the quality of the educational program and the opportunity for an extensive training experience. The programs themselves were designed not for the purpose of meeting the hospital's staffing requirements, but rather to allow the [housestaff] to develop, in a hospital setting, the clinical judgment and

the proficiency in clinical skills necessary to the practice of medicine in the area of [their] choice. . . . The 'Essentials,' which describe the standards for approved internships and residencies, indicate that the primary function is educational. . . .

"In sum, we believe that interns, residents, and clinical fellows are primarily students. We conclude, therefore, that they are not employees within the meaning of Section 2(3) of the Act. Accordingly, no question affecting commerce exists concerning the representation of 'employees' of the Employer within the meaning of Section 9(c) of the Act, and we shall dismiss the petition herein." (*Id.*, at pp. 251, 253.)

Within six months after filing its *Cedars* decision, the NLRB further explained its rationale. In *Kansas City General Hospital and Medical Center* (1976) 225 NLRB 108 [92 LRRM 1379] (hereafter *Kansas City General Hospital*)), the board had dismissed another housestaff representation petition, relying on *Cedars,* but had included language to the effect that the hospital employer was not an "employer" as defined in the Act, because its housestaff were not "employees" under section 2(3). A New York trial court picked up this reference and held that since the NLRB was now saying that private hospitals were not "employers"—defined in the Act in an interlocking way with other terms so as to establish, inter alia, the NLRB's federally preemptive range of jurisdiction over labor representation decisions—then the *states* could regulate that subject with respect to housestaff in private hospitals.

The NLRB closed this "loophole" by filing a "Revised Decision and Order" in *Kansas City General Hospital,* nunc pro tunc, in which it deleted the language about "employers" and reiterated *Cedars'* finding that housestaff's nonemployee status was dispositive. In addition, the NLRB's revised, four-to-one opinion (the earlier decision had been rendered by a three-member panel) further recharacterized *Cedars* as having held that to extend collective bargaining to housestaff would be antithetical to the policies and purposes of the NLRA (which *Cedars* actually had never explicitly held). I quote the concluding paragraph of the NLRB's revised opinion: "Turning to the preemption question, we believe that it has now become necessary for us to state explicitly that which is, in our view, implicit in the Board's Decision in *Cedars-Sinai;* that is, at the risk of being somewhat repetitious, that the majority of this Board intended by its decision therein to find Federal preemption of the health care field to preclude States from exercising their power to regulate in this area. It is our judgment that the Congress, in passing the 1974 health care amendments, simply made a determination that residents, interns, and fellows, *inter alia,* were not super-

visors within the meaning of the Act, but left the question as to whether they were 'employees' entitled to collective-bargaining rights for resolution by the Board in the exercise of its discretion. Having exercised its discretion in *Cedars-Sinai,* by finding residents, interns, and fellows to be primarily students and not 'employees' within the meaning of the Act, the Board confirmed, in our view, that it has not put hospital residents and interns beyond the reach of national labor policy, but has rather held that to extend them collective-bargaining rights would be contrary to that very policy." (225 NLRB at p. 109 (fn. omitted).)

From the standpoint of administrative functions and effects, this recharacterization of *Cedars* was accurate. In *Board* v. *Hearst Publications* (1944) 322 U.S. 111 [88 L.Ed. 1170, 64 S.Ct. 851], the Supreme Court explained that by defining employees only generally in the Act the Congress had entrusted to the NLRB resolution of whether particular employees fell within that statutory definition, and that in performing this function the NLRB was not limited by state law concepts but rather was supposed to apply and vitalize "federal legislation, administered by a national agency [and] intended to solve a national problem on a national scale." (*Id.,* at p. 123 [88 L.Ed. at p. 1180]; see *id.,* at pp. 120-124, 130-132 [88 L.Ed. at pp. 1178-1181, 1184-1185].) On the other hand, Member Fanning—again the sole dissenter—was also correct in noting that the NLRB had gone about its business in an awkward way. (See *Kansas City General Hospital, supra,* 225 NLRB at p. 109 (dis. opn.).)[7]

---

[7]"I dissent from my colleagues' decision to reconsider, *sua sponte,* the original decision in this case, and from their reconsidered decision.

"I would not be averse to reconsideration if the purpose were to reverse my colleagues' decision that interns, residents, and fellows employed by the Employer are not employees within the meaning of Section 2(3) of the Act. Such a reversal would not only remove an aberration from the law, it would also achieve what my colleagues profess to be their goal herein—establishment beyond question of the proposition that the Act has preempted state regulation of labor relations of hospitals and housestaff.

"My colleagues' reconsideration, however, is limited to the withdrawal from their original decision herein of the finding that, 'Hospital Hill is not an "employer" within the meaning of Section 2(2) of the Act for the purpose of any dispute relating to such personnel.' In their view such language was unnecessary to the original decision and 'has prompted the New York Supreme Court to resolve improperly the preemption question.' So, 'to eliminate any doubt that it was the intention . . . in *Cedars-Sinai* to find state jurisdiction over residents, interns, and fellows to have been preempted by the Federal statute,' my colleagues have withdrawn the finding of nonemployer status of the hospital in its relation *vis-à-vis* housestaff.

"Of course, simply withdrawing the finding does not change the relationship. If housestaff are not 'employees' of the hospital, it is rather difficult to establish the proposition that the hospital is their 'employer.' But I do not read my colleagues' opinion as trying to establish that proposition; they wish merely to withdraw their own statement in recognition of the contrary, hopeful, apparently, that once withdrawn no state court or board will be perceptive of the reality behind their *Cedars-Sinai* decision. To that extent, my colleagues perform

I pause at this point to make two general comments about the significance of the *Cedars* decision to the national housestaff-university contest over collective bargaining and about *Cedars'* relationship to the NLRB's subsequent decision in *St. Clare's Hospital & Health Center* (1977) 229 NLRB 1000 [95 LRRM 1180] (*St. Clare's*). The majority opinion has seriously underestimated *Cedars'* importance in both contexts.

First, the majority opinion notes that *Cedars* was not an enthusiastically received decision in all quarters. (*Ante,* p. 610.) That is true, and *Cedars'* interpretation and application of the NLRA is certainly an interesting topic for academic debate. However, that holding is now final: not only was *Cedars* repeatedly reaffirmed by the NLRB (e.g., in *Kansas City General Hospital*), it later was judicially upheld as not clearly erroneous and therefore unreviewable under the NLRA, in *Physicians Nat. House Staff Ass'n v. Fanning* (D.C. Cir. 1980) 642 F.2d 492 [57 A.L.R. Fed. 577] (en banc), cert. den. (1981) 450 U.S. 917 [67 L.Ed.2d 342, 101 S.Ct. 1360]. The result of this condition of federal law is that, according to one of our informed amici, 64 percent of the 1,554 hospitals which today sponsor residency programs in the United States are controlled by that decision, and their housestaff accordingly are denied collective bargaining unless the hospitals agree to engage in it voluntarily.

Second, a proper understanding of the NLRB's position concerning housestaff's status as "employees" vel non under the NLRA requires that *Cedars* and its rationale not be disregarded in favor of the *St. Clare's* decision. *Cedars* was and is the seminal and dispositive interpretation of the Act concerning housestaff. It also was the case in which the NLRB rendered its findings of fact concerning housestaff's predominantly educational objectives and the educational purposes of residency programs, some of which I have quoted above. (*Ante,* pp. 629-630.) In contrast, *St. Clare's* was an opinion rendered upon denial of a motion for reconsideration,[8] which the

---

merely a useless and futile act. They do not stop there, however. They have added the finding, not found in the original decision, that 'Petitioner is not a labor organization within the meaning of Section 2(5) of the Act, because, it is composed solely and exclusively of individuals who are not "employees" within the meaning of the Act,' and they insist that their *Cedars-Sinai* decision simply resolved a question of policy that Congress had entrusted the Board to make, and that therefore, having, in the exercise of discretion decided to withhold from housestaff the operation of those provisions of the Act which would protect their right to organize and bargain collectively, no state can enter the field to bestow upon housestaff such protection under state laws."

[8]In its original decision in *St. Clare's,* the NLRB had summarily dismissed the union's petition for representational recognition, citing *Cedars.* (*St. Clare's Hospital and Health Center* (1976) 223 NLRB 1002 [92 LRRM 1001].) The union filed a motion for reconsideration, and the *St. Clare's* opinion referred to in the majority opinion (*ante,* p. 611) and in the text here was rendered upon denial of that motion.

NLRB used as a vehicle for expounding how *Cedars*—at least in the majority's view—had been consistent with prior NLRB decisions concerning student employees. (See *St. Clare's,* 229 NLRB at pp. 1000, 1003.)

Moreover, while *Cedars* had been decided by a four-to-one majority, *St. Clare's* drew not only a renewed dissent from Member (now Chairman) Fanning, but also a special concurrence from another member, Jenkins. He stated, "I concur, on the basis of *Cedars-Sinai* and *Kansas City General Hospital,* in the result reached by the majority, but in very little of their additional reasoning. . . . [I]t is necessary that I disassociate myself from the majority decision, except in result." (*Id.,* at pp. 1004-1005 (conc. opn.).) And in fact, the *St. Clare's* majority opinion disclosed that yet another NLRB member, Murphy, "is sympathetic to Member Jenkins' concurrence because she agrees that the decisions in *Cedars-Sinai* and *Kansas City General Hospital* [remainder of citation omitted] adequately set forth the Board's reasoning. However, under the circumstances of this case, she joins the majority herein." (*Id.,* at p. 1000, fn. 11.)

I do not by these comments mean to suggest that *St. Clare's* was not a significant decision by the NLRB concerning student employees. It was, and it underscored the second rationale to *Cedars'* exclusion of housestaff from the Act's category of covered employees that the NLRB had articulated in *Kansas City General Hospital* (namely, that collective bargaining by student employees who "are serving primarily as students and not primarily as employees" is incompatible with the policies and purposes of the Act). (*St. Clare's,* 229 NLRB at p. 1002; see also *id.,* at pp. 1003-1004.) What I do mean to stress is that *St. Clare's* was a reaffirmation as well as an "expansion" of *Cedars,* and that *Cedars* remained (and remains) at least as important as *St. Clare's,* if not more so, to our understanding of the NLRB's treatment of housestaff that preceded the enactment of HEERA in 1978.

In fact, as will shortly be seen, *Cedars*—as well as its parallel and discordant state court counterparts discussed hereinabove—constitutes an immensely significant element of the legislative history and meaning of the statute at issue in this case, subdivision (f). The extent of this significance has been "hidden in plain sight" throughout the six years during which this case has been pending—hidden in a verbal "riddle" (to use the Court of Appeal's term) that has eluded all of us but which, upon a few moments critical and dispassionate analysis, becomes clear. I proceed now to the principal topic at hand, the California legislative solution to the University-housestaff controversy over collective bargaining.

II

THE LEGISLATURE'S MANDATE: PARTIAL REJECTION OF *ST. CLARE'S*
BUT CODIFICATION OF *CEDARS* FOR HOUSESTAFF

In 1977, one year after *Cedars* and about the time that *Pennsylvania* and *Nebraska* were being handed down, the ongoing national contest over collective bargaining for housestaff moved to California. In that year the Legislature began the process of enacting HEERA, a new collective bargaining statute for the University of California, Hastings College of the Law, and California State University. (See, e.g., Gov. Code, § 3560, subd. (b).)

This was to be, apparently, the first such statute in the United States directed solely at higher education employers and employees.[9] Its enactment presented both the University and its housestaff—the most "overworked and underpaid" student employees—with the opportunity to seek enactment of a definition of covered "employee" that would reduce the uncertainty of outcome that had attended decisions in other jurisdictions, with their general and uninformative definitional statutes. And given the prior cases, there could have been no doubt that the wording of the definition would prove critical: it could reasonably be anticipated—as proved to be so—that the ultimate factual record in any quasi-judicial or judicial proceeding about housestaff's dual identity as students and employees would closely resemble those developed and applied in *Cedars* and its state-court counterparts.

The majority opinion to some extent traces the legislative history of the enactment that ultimately emerged after a year and a half of lobbying and amendment, and purports to analyze the statute and its legislative history in light of the NLRB case law. (*Ante,* pp. 607-612.) The conclusion reached is that the Legislature did not intend to exclude or preclude housestaff from coverage under HEERA. (*Ante,* pp. 608, 617.) But this analysis is incomplete and therefore misleading. An informed appraisal of the very materials considered in the majority opinion yields the same conclusion that a plain but discriminating reading of the statutory language compels: that the Legislature resolved the question of housestaff status in favor of the University's (and the NLRB's) position, by enacting in subdivision (f) a definition of "employee" designed to preordain the result of this administrative proceeding.

The original version of subdivision (f), introduced by Assemblyman Berman on March 24, 1977, was a virtual copy of the definition of employee

---

[9]See Brownstein, *Medical Housestaff: Scholars or Working Stiffs? The Pending PERB Decision* (1981) 12 Pacific L.J. 1127, 1138 & fn. 99 (hereafter *Scholars or Working Stiffs*).

that had been applied in the *Cedars* case (29 U.S.C. § 152(3); fn. 6 *ante*). (Assem. Bill No. 1091 (1977-1978 Reg. Sess.) Mar. 24, 1977.) On May 23, 1977, the bill was amended in the Assembly in a fashion that, on its face, pointed more heavily in favor of housestaff's position: the bill's only exclusions from the omnibus and circular definition of "employees" were altered from simply "managerial and confidential employees" to refer specifically to "employees who are students on the same campus where they are employed and who work less than 10 hours per week . . . ." (Assem. Amend. to Assem. Bill No. 1091 (1977-1978 Reg. Sess.) May 23, 1977.) Clearly, this exclusion evinced a negative pregnant in favor of housestaff, because their herculean work week certainly exceeds 10 hours.

Three days after introduction of this amendment, the NLRB filed its decision denying the motion for reconsideration in *St. Clare's*. I have already explained the significance of that case and placed it in context (*ante*, pp. 632-633). There, the NLRB explains that: "The rationale for dismissing such petitions [as this] is a relatively simple and straightforward one. Since the individuals are rendering services which are directly related to—and indeed constitute an integral part of—their educational program, they are serving primarily as students and not primarily as employees. In our view this is a very fundamental distinction for it means that the mutual interests of the students and the educational institution in the services being rendered are predominantly academic rather than economic in nature. Such interests are completely foreign to the normal employment relationship and, in our judgment, are not readily adaptable to the collective-bargaining process. It is for this reason that the Board has determined that the national labor policy does not require—and in fact precludes—the extension of collective-bargaining rights and obligations to situations such as the one now before us." (229 NLRB at p. 1002 (fn. omitted).)[10]

---

[10]A fuller understanding of the portions of *St. Clare's* concerning students employed on their own campuses requires quotation of two other short passages from the opinion.

(1) Here is the full text of the NLRB's explanation of why students so employed in jobs unrelated to their educational objectives are denied bargaining rights, explaining that it is because they are in fact transitory employees even though from the standpoint of their purposes, educational objectives are subordinate:

"A second category of Board decisions involving students is that in which the students are employed by their own educational institutions in a capacity unrelated to their course of study. In such cases, the Board has historically excluded the students from units which include nonstudent employees, and have not afforded them the privilege of being represented separately. The Board has reasoned that in these situations employment is merely incidental to the students' primary interest of acquiring an education, and in most instances is designed to supplement financial resources.

"As in the first category, the students' motive for seeking employment cannot be deemed educational in the sense that it directly enhances their education, and thus in terms of their employment responsibilities they, too, must be considered 'primarily employees.' However,

One year later, Senator Carpenter received a Legislative Counsel's opinion concerning whether the still extant 1977 version of subdivision (f) would cover housestaff. I quote the relevant portions of the Legislative Counsel's opinion as follows:

"Generally speaking, the provisions of A.B. 1091 parallel those of the National Labor Relations Act, as amended (Sec. 151 et seq., Title 29, U.S.C.). The National Labor Relations Board, the federal agency which administers the National Labor Relations Act, has concluded that interns and residents are 'primarily students' rather than 'employees' and thus, are not covered by the National Labor Relations Act (*St. Clare's Hospital and Health Center and the Committee of Interns and Residents*, 229 NLRB No. 158, 1977-78 CCH NLRB Para. 18,201; and *Cedars-Sinai Medical Center*, 223 NLRB No. 57, 1975-76 CCH NLRB Para. 16,690; see, however, H.R. 2222 which would amend the National Labor Relations Act to cover such interns and residents, and Report No. 95-980, House of Representatives, 95th Congress, Second Session wherein the majority of a committee reporting on the bill concludes that housestaff are employees).[11]

"We think that in the absence of any more definitive statements in A.B. 1091, the courts would conclude that a similar construction is intended under A.B. 1091 to that given the provisions of the National Labor Relations Act (see *Estate of Simpson,* 43 Cal.2d 594, 600).

---

since their status as employees is in most instances directly related to their continued enrollment at the educational institution, their relationship to the bargaining unit is normally viewed as transitory. It is primarily for this reason that the Board generally excludes students from bargaining units of full-time employees at their own educational institutions." (229 NLRB at p. 1001.)

(2) Here is the opinion's discussion of a notable problem with bargaining by housestaff, again explaining (as in the quotation in text) their exclusion as grounded in the national labor policy, and thus, like *Kansas City General Hospital,* "adding" a rationale to *Cedars'* dispositive finding of fact that housestaff's educational objectives are the predominant reason for their pursuing the employment:

"The subject of hours, for example, is of particular relevance when speaking of housestaff. Residents and interns work notoriously long hours. From a strictly educational standpoint, such hours may be necessary in order to provide the students with as broad an experience as possible. Also, it may be educationally desirable for a particular student not only to prepare the diagnosis of a patient, but to administer the treatment as well. Unfortunately, medical emergencies do not always conveniently occur between the hours of 9 a.m. and 5 p.m., Monday through Friday. Thus, the flexibility which medical educators need to schedule shifts, assignments, transfers, etc., in an educationally sound fashion could become bargainable should the housestaff be afforded collective-bargaining privileges." (*Id.,* at p. 1003.)

[11]This legislation was later defeated in the House, with "[o]pponents of the bill stat[ing] their agreement with the NLRB's position that collective bargaining was inappropriate for house staff because their relationship with their hospitals was primarily an educational one." (*Physicians Nat. House Staff Ass'n* v. *Fanning, supra,* 642 F.2d at p. 498.)

"In this connection, however, it should be noted that A.B. 1091 in its definition of 'employee' specifically excludes employees who are students on the same campus where they are employed and who work less than 10 hours per week, thus implying that employees who are students on the same campus where they are employed and work more than 10 hours per week are employees under the bill.

"While this indicates an intention to cover students who are employees under some circumstances, it does not resolve the essential issue imposed by the National Labor Relations Board as determining the coverage of student employees. The Board in the *St. Clare's Hospital* case, *supra,* stated as follows: 'Since the individuals are rendering services which are directly related to—and indeed constitute an integral part of—their education [*sic*] program, they are serving primarily as students and not primarily as employees. In our view this is a very fundamental distinction for it means that the mutual interests of the students and the educational institution in the services being rendered are predominantly academic rather than economic in nature. Such interests are completely foreign to the normal employment relationship, and in our judgment, are not readily adaptable to the collective-bargaining process. It is for this reason that the board has determined that national labor policy does not require—and in fact precludes—the extension of collective-bargaining rights and obligations to situations such as the one now before us.' (1977-78 CCH NLRB Para. 18,201 at page 30,212.)

"Thus, the inclusion of students as employees without making any distinction between those employed merely for economic reasons and those employed as a part of the educational program does not resolve the question concerning the status of interns and residents, and, in construing A.B. 1091, we think it more probable that the courts would follow the construction given similar provisions of the National Labor Relations Act." (Ops.Cal.Legis. Counsel, No. 7522 (May 24, 1978) Housestaff Physicians, pp. 2-4.)

The majority opinion infers that the next and ultimate version of subdivision (f) was written and enacted in response to this Legislative Counsel Opinion, and states that consideration of the statutory history "in conjunction with [the] Legislative Counsel's opinion" creates an "inescapable . . . conclusion" concerning the Legislature's intentions regarding housestaff coverage under HEERA. (*Ante,* p. 608.) I concur. I also concur with the majority opinion that the question how the Legislature responded to the challenge laid down by its counsel's opinion may—indeed must—be answered by ascertaining the intent of the Legislature from the very language it used, aided to the extent necessary by consideration of the legislative

history. (See *ante,* pp. 607, 609.) Where I differ with the majority opinion—diametrically—is in what the "plain meaning" of this statute is, generally and concerning housestaff in particular.

The relevant language of subdivision (f) reads thus:[12] "The board may find student employees whose employment is contingent on their status as students are employees *only if* [1] the services they provide are unrelated to their educational objectives, or, [2(a)] that those educational objectives are subordinate to the services they perform and [2(b)] that coverage under this chapter would further the purposes of this chapter." (Italics and bracketed numbers added.) This is quite a complex verbal formula, and comprehension of its plain meaning requires that one take it a step at a time; hence my bracketed division of the sentence. I proceed to explain and interpret the words of the statute, harmoniously together but with reference to the separate clauses I have indicated.

First, clause [1], which in context provides that PERB may find student employees to be "employees" if the services they provide are unrelated to their educational objectives. This is a variant of the scheme of the NLRA as discussed in *St. Clare's.* Recall two things. First, under the NLRA's definitional section, 29 United States Code section 152(3), employees are defined only generally—and in virtually the exact language used in subdivision (f) before our "student" portion—and the NLRB does the rest of the defining in its discretion, balancing various factors such as its perception of the demands of "the national labor policy." (See *ante,* pp. 607-608, 610; *Physicians Nat. House Staff Ass'n* v. *Fanning, supra,* 642 F.2d at pp. 496-497.) Second, in *St. Clare's* the NLRB declared that students employed by their schools "in a capacity unrelated to their course of study" were to be denied collective bargaining. (See *ante,* fn. 10.) The plain meaning of clause [1] of subdivision (f) thus is a qualified partial rejection of this approach. Presumably conscious of the Legislative Counsel's expectation that the courts—including if necessary this court—would construe subdivision (f)

---

[12]The full text of subdivision (f) is: "(f) 'Employee' or 'higher education employee' means any employee of the Regents of the University of California, the Directors of Hastings College of the Law, or the Board of Trustees of the California State University, whose employment is principally within the State of California. However, managerial, and confidential employees shall be excluded from coverage under this chapter. The board may find student employees whose employment is contingent on their status as students are employees only if the services they provide are unrelated to their educational objectives, or, that those educational objectives are subordinate to the services they perform and that coverage under this chapter would further the purposes of this chapter."

This is the original text, except for an immaterial 1983 amendment occasioned by the renaming of California State University.

much as the NLRB had construed 29 United States Code section 152(3)[13] the Legislature here empowered PERB and the courts to deviate from the *St. Clare's* dictum and bring student employees who provide services to their campus unrelated to their educational objectives into subdivision (f)'s legal definition of employees entitled to collective bargaining.

In short, subdivision (f) as a whole parallels 29 United States Code section 152(3) in general, but with respect to students whose employment is unrelated to their studies (e.g., cafeteria workers at UCLA majoring in physics) it *permits* the PERB to deviate from NLRB precedent (*St. Clare's* and its antecedents) if it so chooses, in its informed discretion.

Having thus clarified clause [1], I turn to the more critical portion of subdivision (f), my clause [2(a)]. It is this portion of subdivision (f) that was addressed, at least inter alia, to housestaff, and which governs this case.

Like clause [1], clause [2(a)] was enacted in direct response to the Legislative Counsel's advice to its client that the status of housestaff under Assembly Bill No. 1091 could not be definitively resolved without making explicit "distinction[s] between those employed merely for economic reasons and those employed as a part of the educational program . . . ." (Ops. Cal. Legis. Counsel, *supra,* p. 3.) The Legislature took up this challenge, and did resolve the distinction, in a novel and sophisticated fashion. Clause [2(a)] empowered PERB to deviate from NLRA precedents, and find that students employed in capacities related to their studies are employees for purposes of HEERA, but "*only*" if PERB first found as a matter of fact that their "educational objectives are subordinate to the services they perform" (and then also concluded "that coverage under this chapter would further the purposes of this chapter").

Now, what is the meaning of the legal standard set down to guide and govern PERB in making its necessary determination of fact? This is the "riddle" which the Court of Appeal came very close to solving, and which PERB and the majority opinion have studiously ignored in their treatment of the central problem of this case. What does it mean?

The majority opinion implies that the statute charged PERB with performing a balancing test between the relative weight of educational objectives

---

[13]This is of course the court's traditional approach, as a UCLA law professor who formerly was chairperson of PERB noted in a 1980 law review article contemplating future application and interpretation of the then newly enacted HEERA. (Alleyne, *Instituting Collective Bargaining at California's Universities and Colleges: The Outlines of HEERA* (1980) 31 Hastings L.J. 563, 575 & fn. 56 (hereafter *The Outlines of HEERA*).)

and services performed. (*Ante,* p. 618.) That is not quite the whole story. One cannot "balance" apples and oranges without first calibrating the scale.

Finally, the majority suggests that the correct test requires PERB to look further than the students' own motivation for accepting employment, and must examine "the services actually performed—to determine whether the students' educational objectives take a back seat to their service obligations." (*Ante,* p. 614.) This analysis represents the crucial difference between the majority's position and my own: I believe that HEERA assigns *primary* weight to the students' own educational objective and purpose in performing the services involved. If the Legislature wanted PERB to concern itself with the educational program itself, and with the question whether it was being properly achieved, the Legislature would have said so. The majority effectively has rewritten HEERA.

We return then to the plain language of the statute: "those educational objectives are subordinate to the services they perform." Whose educational objectives? Obviously, the students' educational objectives: the immediate antecedent of "those educational objectives" is "their educational objectives," which is used in clause [1] to refer to the educational objectives of the students. What does "subordinate" mean? When used as part of a comparative adjectival phrase contrasting two disparate things, it means, either "placed in or belonging to a lower order or rank" or, more aptly, "of less importance; secondary." (Random House College Dict. (rev. ed. 1982) p. 1309.) And how can educational objectives be subordinate to services performed when these are apples and oranges? The answer is, only subjectively, in the contemplation and intention of the students (and in the purposes of their University).

In other words, clause [2(a)] empowered PERB to find that students who are performing services related to their educational objectives are "employees" under HEERA only if those students' educational objectives (in so performing services) are of less importance to them (or to the University) than the services they perform. But if the students' educational objectives in performing services are primary (not secondary) among the students' (or the University's) purposes, PERB may not find those students to be employees under HEERA.[14]

---

[14]Conceptually and actually, the students' (housestaff's) and the University's priorities among educational objectives and services are identical. The hearing examiner in this case summarized the evidence to this effect as follows: "[A]ll housestaff witnesses testified [that] their educational objectives in choosing and participating in a residency program are to receive the best medical training and qualify for specialty or subspecialty certification. The Essentials themselves state that the primary purpose of a residency program is education.

This could well be called a "primary purpose" test. And such a test, while difficult to unravel semantically from the Legislature's 10 rather colorless words, was and is nothing new to the national housestaff-teaching hospital contest over collective bargaining rights. It was—and it is—the test that decided *Cedars* and *Pennsylvania,* and evoked such howls of protest from the dissenters and the law reviews. That test is what the Legislature adopted in HEERA as the standard PERB should apply in evaluating whether the University's housestaff were to be entitled to collective bargaining.

I have quoted above the majority opinions in *Cedars* and *Pennsylvania* as they utilized this approach to determine that housestaff were not employees under a statute that facially covered all "employees." (*Ante,* pp. 627, 629-630.) But as is often so in legal matters, among the most articulate exponents of a legal rationale that may be difficult to justify under the words of a statute being applied were the dissenters and the law review critics. I shall now let some of them explain the meaning of clause [2(a)] of subdivision (f) just as I have.

In *Cedars,* dissenting Member Fanning decried the majority's reliance on three factors which he thought should not have borne the dispositive weight the majority gave them. These were: (1) the statement in "The Essentials of Accredited Residencies," promulgated by the Liaison Committee on Graduate Medical Education, "'that the primary function is educational'"; (2) the NLRB's finding "'[n]or does it appear that those applying for [housestaff] programs attached any great significance to the amount of the stipend'"; and (3) the majority's finding that housestaff's "'choice [of program] was based on the quality of the educational program and the opportunity for an extensive training experience. . . .'" (223 NLRB at pp. 256-257.) Mr. Fanning criticized the majority's reliance on these factors: (1) "Because the hospitals are instructed to view the primary purpose of housestaff programs as educational has no bearing on whether the housestaff ultimately *performs a service for compensation* . . . ." (*Id.,* at p. 256 (fn. omitted).) In other words, the primary purpose of the residency program may be educational not service, but the housestaff are still literally employees. (2) "In the cases before us, there is some support for the proposition that . . . the primary value attached to an individual residency or subspecialty is the quality of the institution providing that program, and the opportunity of exposure to a wide range of medical experience." (*Id.,* at p. 257.) In other words, the primary purpose of the housestaff may be to

---

The testimony of housestaff witnesses clearly evidences that this educational objective is the *primary reason why housestaff participate in the University's residency programs, and also the primary reason for the existence of the residency programs themselves.*" Thus, my parenthetical references to the University's purposes.

obtain high quality clinical education. (3) "I fail to perceive how the fact that an individual desirous of becoming an orthopedic surgeon chooses a residency program based on its quality and the opportunity for extensive training bears relevance to the question whether, having done so, he or she is an 'employee' under the Act." (*Ibid.*) There are those who may agree with this point, but they do not include the California Legislature: its enactment required that PERB give this factor paramount significance.

I turn now to a law review comment cited in the majority opinion. (Maute, *Student-Workers or Working Students? A Fatal Question for Collective Bargaining of Hospital House Staff* (1977) 38 U.Pitt.L.Rev. 762, cited *ante,* p. 610.) Criticizing both the *Cedars* and *Pennsylvania* decisions, it commenced as follows: "This Note examines the practical and economic realities of the house staff-teaching hospital relationship. Research directed at this relationship indicates that house staff provide substantial and essential services to the hospitals. In exchange for these services they are paid sizeable 'stipends' and are given benefits which are normally associated with employee status. *Cedars-Sinai* and [*Pennsylvania*] are criticized for allowing the primary purpose for affiliation to negate such strong indicia of employment." (*Id.,* at p. 763.) And at the final point page cited in the majority opinion, the note concluded, "Both the *Cedars-Sinai* and [*Pennsylvania*] decisions focused upon primary purpose for affiliation as a legal fiction which fails to account adequately for the realities of the house staff-teaching hospital relationship. Although educational considerations are undoubtedly important in the selection of a hospital, the terms and conditions of the relationship fit within the classical definition of employment. . . . Initial motivations for the relationship should not negate factors which are strongly indicative of an employment relationship. . . ." (*Id.,* at p. 786.) This may or may not be sound advice to a legislature, but the legislative history and language of subdivision (f) establish that the California Legislature rejected it.

Another law review comment cited in the majority opinion was written in contemplation of this very case itself. (*Scholars or Working Stiffs, supra,* 12 Pacific L.J. 1127.) I shall allude to portions of that comment to conclude my analysis of clause [2(a)] and also explain, briefly, the significance of clause [2(b)].

After reviewing *Cedars, St. Clare's, Pennsylvania, Michigan, Nebraska,* and a Massachusetts Labor Commission case,[15] the note presents the following summary:

---

[15]That case, *City of Cambridge and Cambridge Hospital House Officers Association* (1976) 2 MLC 1450, involved a general definitional statute like the NLRB's and a nonuniversity hospital that conducted a residency program incidental to providing service to the local community.

"The differing outcomes of these decisions hinged on the use of the primary purpose test. In those states where a resident's subjective motivation was either ignored or accorded slight weight, housestaff were found to be employees within the meaning of the state's public employment statute. Conversely, the NLRB and the Pennsylvania Supreme Court employed the primary purpose test and held its result to supersede all other factors in importance. Housestaff selection of a particular residency program primarily because of the educational benefits it offered was held to indicate an academic relationship regardless of what other employment indicia existed." (12 Pacific L.J. at p. 1137.)

Having thus described the test imparted by clause [2(a)] of subdivision (f), the comment proposed that PERB disregard it. "The application of Section 3562(f) to the housestaff situation involves a determination of whether housestaff educational objectives are subordinate to the services they perform for the hospital and whether granting housestaff collective bargaining rights would further the purposes of HEERA. In arriving at a decision, PERB should disregard the primary purpose test used by the NLRB, as have the majority of the courts and administrative agencies across the nation. The test has been criticized as virtually meaningless and leads to absurd results if carried to its logical conclusion: two persons working side by side in the same profession may have different motivations for working for a particular employer, but if the interest of one is primarily pecuniary and the interest of the other predominantly educational, the primary purpose test would lead to calling one an employee and the other a student. . . ." (12 Pacific L.J. at p. 1143 (fns. omitted).)

This passage evokes two questions. First, as a factual matter, how often could one expect to find a person who has gone through four years of college and four years of medical school (an intern), or who also has a license to practice plus one to six years' clinical experience (a resident) working an eighty- or one hundred-hour week to earn between $15,000 and $21,800 a year (see maj. opn., *ante,* pp. 605, 618-620) because his or her "motivatio[n] for [so] working . . . is primarily pecuniary"? The answer to this question in this case is "never," according to the PERB hearing officer's summary of the testimony which I quoted above (see *ante,* p. 640, fn. 14). Second, as a legal matter, how could PERB "disregard the primary purpose test" after the Legislature, drawing upon the experience of the NLRB and the state courts, had crafted that test into 10 words mandating and limiting the factual inquiry PERB was to perform?

An answer to the second question is suggested by the Pacific Law Journal comment's next sentences. It proposes that PERB utilize "a balancing test

to weigh" housestaff's and the University's purposes, together with "indicia of student status," against "indicia of employee status[,] the treatment of housestaff as employees . . . and agency principles of master-servant." (12 Pacific L.J. at pp. 1143-1144 (fns. omitted).) There are several serious problems with this suggestion. First, one cannot "balance" or "weigh" housestaff and University *purposes* and student or employee *indicia*—either objectively *or* subjectively. Second, subdivision (f) requires PERB to consider "educational objectives . . . [and] services . . . perform[ed]" not "educational objectives and indicia of student or employee status." In other words, the comment was proposing that PERB "balance" the factors debated by the majority and dissenting opinions in *Cedars* and *Pennsylvania* under statutes that did not define "employee," in disregard of the express definitional language the Legislature had enacted for PERB in response to those (and other) decisions.

I now turn briefly to clause [2(b)] of subdivision (f), starting with a quotation from *Scholars or Working Stiffs,* presenting the author's view of how the Legislature responded in clause [2] of subdivision (f) to *St. Clare's.*

"In Section 3562(f), the California Legislature explicitly rejected *St. Clare's* broad general category of students 'whose services are directly related to their educational program' and divided this classification into two distinct groups: (1) that group of students who perform services which are directly related, but whose educational objectives are subordinate to those services; and (2) that group of students who perform services which are directly related, but whose educational objectives predominate over those services. Coverage under HEERA is to be given to the first group of students if it promotes the purposes of HEERA. . . ." (12 Pacific L.J. at p. 1139 (fns. omitted).)

This analysis comprehends the plain meaning of clause [2]'s words—but *not* their full origins and consequent legal significance. The author has failed to read *Cedars* and *St. Clare's* closely when analyzing the structure and content of subdivision (f), and has failed to consider *Kansas City General Hospital* at all.

As the note says, "Coverage under HEERA is to be given to th[is] . . . group of students if [PERB concludes] it promotes the purposes of HEERA." And that is an issue that was not specifically addressed in *Cedars,* which made only findings of ultimate fact about housestaff's primary purpose. But it *was* addressed, from the standpoint of the NLRA, in *Kansas City General Hospital* and again in *St. Clare's.* There, the NLRB "added" a rationale to *Cedars* and explicitly stated that extending coverage of the

NLRA to housestaff would *not* promote the purposes of the Act. (See *ante,* pp. 630-631, 635, 637.)

Thus we see the true nature and meaning of the legislative compromise wrought by subdivision (f). Clause [1] allowed PERB to deviate from the NLRB's approach to collective bargaining rights for student-employees of the University who are working unrelated to their educational program. But clauses [2(a)] and [2(b)] were written to confine PERB's evaluation of housestaff (and other "relatedly employed" students) in such a manner that housestaff would have to leap two potentially insuperable hurdles to qualify as employees under subdivision (f). Of course, there was always the possibility that PERB or the courts would interpret the purposes of HEERA as sufficiently distinct from those of the NLRA to permit the "policy" hurdle to be crossed. (But see *The Outlines of HEERA, supra,* 31 Hastings L.J. at p. 564.) But the "subordinateness" hurdle, which comes first, involves a question of fact. Only by ignoring the full meaning of clause [2(a)] and hence the legal import of the facts found by its hearing examiner and purportedly adopted in whole could PERB find housestaff met that qualification.

By this time, the reader should perceive how profoundly Part II of the majority opinion has failed to analyze the question it purports to address (the meaning of the statute and the intent of the Legislature concerning housestaff). The majority opinion observes, "[i]t is noteworthy that at the time HEERA was enacted the vast majority of decisions from other jurisdictions had concluded that housestaff are employees within the meaning of their respective collective bargaining statutes" (*ante,* p. 616), without explaining how those statutes differed from subdivision (f) and why. The majority opinion states that while the statutes did differ, "many of the factors which led to the conclusion that housestaff are employees are similar to those which are appropriately considered under a subdivision (f) analysis" (*ante,* p. 616)—without explaining what factors were involved or how they are even *relevant*. And so the majority opinion concludes its analysis of the statute and declares that "the only remaining issue is whether there is substantial evidence to support [PERB's finding]" (*ante,* p. 617). As I will explain, the majority found that substantial evidence existed to support PERB's decision, but neither the majority nor PERB used the correct statutory standard with which to weigh and consider that evidence. Accordingly, both their decisions are fatally flawed.

This concludes my analysis of the statutory language and legislative history, except for one other point about the intent of the Legislature concerning housestaff.

The majority opinion states that subdivision (o) of Government Code section 3562—HEERA's definition of "professional employee," hereafter subdivision (o)—[16]"corroborates the conclusion" that the Legislature intended to allow PERB to reach housestaff under subdivision (f). (*Ante,* p. 615.) But in its decision, PERB did not address the applicability of subdivision (o). The reason for this omission requires full explanation.

Subdivision (o) was modeled directly on, and is effectively identical to, section 2(12) of the NLRA, 29 United States Code section 152(12). This section of the Act comes into play chiefly in conjunction with section 9(b) (29 U.S.C. § 159(b)), which limits the NLRB's discretion in determining *the appropriate collective bargaining unit by specifically providing* "That the Board shall not (1) decide that any unit is appropriate . . . if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit . . . ." In HEERA, subdivision (o) serves a similar function: Government Code section 3579, which controls PERB's determination of appropriate bargaining units, provides that "There shall be a presumption that professional employees and nonprofessional employees shall not be included in the same representation unit. However, the presumption shall be rebuttable . . . ." (Gov. Code, § 3579, subd. (b).) The former chairperson of PERB has suggested that although "HEERA's treatment of professional and nonprofessional employees thus appears to differ from NLRA treatment of the subject, . . . the differences between HEERA and NLRA treatment of professional employee units may be more apparent than real. . . ." (*The Outlines of HEERA, supra,* 31 Hastings L.J. at p. 577, fn. 62.)

In any event, there is no material difference between HEERA's subdivision (o) and its NLRA counterpart.[17] And under the NLRA, "subdivision

---

[16]Subdivision (o) provides: "Professional employee means:

"(1) Any employee engaged in work: (i) predominately intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work; (ii) involving the consistent exercise of discretion and judgment in its performance; (iii) of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; and (iv) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning or a hospital, as distinguished from a general academic education or from an apprenticeship or from training in the performance of routine mental, manual, or physical processes; or

"(2) Any employee who: (i) has completed the courses of specialized intellectual instruction and study described in clause (iv) of paragraph (1), and (ii) is performing related work under the supervision of a professional person to qualify himself to become a professional employee as defined in paragraph (1)."

[17]The only literal differences are that subdivision (o) has numbered not lettered paragraphs, includes a conjunctive "and" where the federal statute uses only a semicolon, and substitutes "predominately" for "predominantly."

(o)'' has been conclusively adjudicated not to provide any support for housestaff's position that they should be found ''employees.'' That issue was decided in *Cedars,* where the NLRB held that since housestaff were not ''employees'' under a standard later codified in clause [2(a)] of subdivision (f), ''we find no merit in [housestaff's] contention that they are employees based on Sec. 2(11) and (12) of the Act, which defines the terms 'supervisor' and 'professional employee,' respectively.'' (*Cedars,* 223 NLRB at p. 253, fn. 4.)

Member Fanning's dissent on this issue was as emphatic as any part of his opinion, if not more so. (See *id.,* at pp. 257-259 (dis. opn.).) But it remained a minority position. In *Physicians' Nat. House Staff Ass'n* v. *Fanning, supra,* a closely divided United States Court of Appeals for the District of Columbia Circuit, en banc, held inter alia that the NLRB had correctly interpreted the statute. (*Id.,* 642 F.2d at p. 497.)[18] The United States Supreme Court denied certiorari. And that will probably be the last word from the federal courts on the matter, unless the NLRB someday changes its own position. For the overall holding of the court of appeals was that judicial review of the NLRB's interpretation and application of the Act in *Cedars* was not within federal jurisdiction, ''because the issue did not come within the exception to the non-reviewability of representation decisions established by *Leedom* v. *Kyne,* 358 U.S. 184.''

The last quotation comes directly from PERB's decision. That is the reason why PERB did not and could not rely upon subdivision (o). I quote again from the PERB decision (this time rejecting the University's position that *Cedars* and *St. Clare's* should be followed in applying subdivision (f))—

''The construction of similar or identical provisions of the NLRA may be used to guide interpretation of HEERA. See, e.g., *San Diego Teachers*

---

[18]''The Act's definition of 'professional employees' does not help the appellants as they suggest. Section 2(12) of the Act, 29 United States Code section 152(12) (1976) states:
''The term 'professional employee' means—
''(a) any employee engaged in work . . . (iv) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning or a hospital . . . or
''(b) any employee, who (i) has completed the courses of specialized intellectual instruction and study described in clause (iv) of paragraph (a), and (ii) is performing related work under the supervision of a professional person to qualify himself to become a professional employee as defined in paragraph (a).
''Because this definition is applicable to 'any employee', it is not a command to the Board to regard anyone as an employee. Rather, it classifies those persons who are already employees. House staff can not be 'professional employees' unless they are first found to be 'employees'.''

*Assn.* v. *Superior Court* (1979) 24 Cal.3d 1 [154 Cal.Rptr. 893]; *Firefighters Union* v. *City of Vallejo* (1974) 12 Cal.3d 608, 616 [116 C.R. 507.].''

## III

### THE PROPER DISPOSITION OF THIS CASE

With the meaning and intent of subdivision (f) clarified, it remains only to explain how the Legislature's scheme went awry.

PERB's hearing officer made detailed findings of evidentiary facts concerning the nature and conduct of the residency program, including both its "student" and "employee" attributes. Predictably, they closely paralleled the facts presented in the majority and dissenting opinions in *Cedars*. (See 223 NLRB at pp. 251-253; *id.*, at pp. 255-257 (dis. opn.).) However, there was one major difference between this case and *Cedars*. This case involved the University as the employer, and hospitals that were founded and maintained for the very purpose of enabling the University to conduct a postgraduate medical teaching program.

The hearing officer then made his proposed findings of ultimate fact and conclusions of law, while dealing with the contentions of the parties.[19]

As the majority opinion states, "PERB rendered a written decision adopting the hearing officer's findings of facts and making additional factual findings." (*Ante,* p. 605.) These findings are set forth in PERB's decision and are similar to the analysis presented in the majority opinion. (See *ante,* pp. 618-621.) They are truly remarkable. PERB ignored the findings of fact it had "adopted," and took the Pacific Law Journal comment's suggestion one step further. Recognizing that it could not balance indicia of employment and student (University) purposes, objectively or subjectively, PERB did neither. Instead, it simply emphasized the one side of the "balance" that the statute does not address (indicia of employment).

When dealing with the Essentials, PERB gave weight only to the statements therein concerning employment indicia and to the portion reiterating that an accredited *hospital's* primary purpose is patient care. That, of

---

[19]Although this section of the proposed decision is entitled "Discussion and Conclusions of Law," the hearing officer recognized that his proposed determination under clause [2(a)] was one of ultimate fact, albeit involving application of the law.

course, is a truism for all hospitals, as the Essentials recognize. But what of the further statement in the Essentials that the primary purpose of the residency program is educational—the standard to which the University's residency program must adhere and perhaps the best evidence of the University's purposes? PERB deemed it "not . . . relevant to the Board's inquiry," on grounds that the Essentials were "not concerned with the statutory question of whether housestaff are 'employees' within the meaning of HEERA."

That is just what Member Fanning, in sole dissent, had said in *Cedars.* (See *ante,* p. 641.) But given the Legislature's adoption of the *Cedars* majority approach in subdivision (f), the Essentials' directive that residency programs' primary purpose is educational was critically relevant, in that it demonstrated the educational objectives of the University, its hospitals, and its students (housestaff).

In short, PERB did not do any balancing at all. Instead, it found, in conclusionary fashion, that the University's residency program was a fiction: an enterprise designed for educational purposes but conducted in a fashion only to serve the patient community. I quote the decision:

"[T]he record demonstrates that the educational benefits housestaff derive from their activities are incidental and therefore subordinate to the primary health care services they provide the patients." Thus, PERB ignored subdivision (f)'s terms—which speak of "educational objectives," not "educational benefits derived," and services students "perform," not "provide to patients"—and it also ignored the undisputed evidence of the students' own purposes and educational objectives (see *ante,* p. 640, fn. 14).

Similarly, PERB found that "the educational objectives *of the residency program* are subordinate to the delivery of services housestaff provide."[20] The board clearly misapplied the correct test, which would require determination of the *students'* educational objectives. In addition, PERB mischaracterized the test as involving "the educational objectives *underlying their [the students] duties* (italics added), but nothing in the statute allows their "duties" to control or modify their educational objectives. PERB likewise referred to and used as a factor "employment characteristics," but indicia of employment are irrelevant to the students' own educational objectives or even the nature and extent of the services they actually perform.

---

[20]The majority mischaracterizes PERB's findings in this regard, stating that "The Board found that the educational objectives were subordinate to the services . . . ." (*Ante,* p. 606.) PERB made no express findings regarding the students' own educational objectives.

What then is the proper disposition of this case? It is to grant the University's petition for writ. That petition is not a petition for writ of review, but actually a petition for writ of mandate. (See *Tex-Cal Land Management, Inc.* v. *ALRB* (1979) 24 Cal.3d 335, 350 [156 Cal.Rptr. 1, 595 P.2d 579].) And since we here are reviewing a final, quasi-adjudicative administrative decision, this may well be considered a petition for writ of administrative mandate under Code of Civil Procedure section 1094.5. (Compare *Saleeby* v. *State Bar* (1985) 39 Cal.3d 547, 560-561 [216 Cal.Rptr. 367, 702 P.2d 525]; see also Gov. Code, § 3564, subd. (c) [applying the Code of Civil Procedure's writ provisions to this proceeding "except where specifically superseded herein."].) But in any event, PERB has clearly abused its discretion and failed to proceed in the manner required by law, namely subdivision (f).

I therefore would grant the University's petition and issue a peremptory writ of mandate requiring PERB to set aside its decision and render a new decision that contains findings applying the statute as it was written to the facts in the record.

Lucas (Malcolm), J., concurred.

On May 1, 1986, the dissenting opinion was modified to read as printed above.