[No. A046075. First Dist., Div. Three. May 22, 1992.]

ASSOCIATION OF GRADUATE STUDENT EMPLOYEES, DISTRICT 65, UAW, Petitioner, v.
PUBLIC EMPLOYMENT RELATIONS BOARD, Respondent;
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Real Party in Interest.

## COUNSEL

Schwartz, Steinsapir, Dohrmann & Sommers, Stuart Libicki and Margo A. Fineberg for Petitioner.

John W. Spittler and Donn Ginoza for Respondent.

James E. Holst, James Nellis Odell, Claudia Cate and Edward M. Opton, Jr., for Real Party in Interest.

## OPINION

**WHITE, P. J.**—In *Regents of University of California* v. *Public Employment Relations Bd.* (1986) 41 Cal.3d 601 [224 Cal.Rptr. 631, 715 P.2d 590] (*Regents*), the Public Employment Relations Board (PERB) determined that housestaff participating in University of California medical residency programs were employees for purposes of coverage under the Higher Education Employer-Employee Relations Act (HEERA). (Gov. Code, § 3560 et seq.) The *Regents* court upheld PERB's determination. The question raised by this petition is whether graduate students enrolled at the University of California, Berkeley (University), who work as research assistants and teaching assistants should be considered employees of University entitled to collective bargaining rights. In this case, PERB has decided that neither graduate student instructors (GSI's) nor graduate student researchers (GSR's) are employees. The Association of Graduate Student Employees, District 65, UAW (Association), challenges that decision. We conclude that PERB has

improperly substituted a new test for the test prescribed by the first prong of the last clause of Government Code section 3562, subdivision (f), as interpreted by *Regents*. However, we affirm the decision because PERB has correctly applied the second prong of the statute.

## EVIDENCE ABOUT GRADUATE STUDENT EMPLOYMENT

In 1984, when the unfair labor practice charges were pending before PERB, some 8,000 graduate students and 19,000 undergraduate students attended University. Nearly one-half of the graduate students were employed as either research assistants or teaching assistants. Of these, about 60 percent were employed as GSR's and 40 percent as GSI's. Over 70 percent of the research positions were in science and engineering. During the 1983-1984 school year, GSI's were responsible for 58 percent of the class meetings in lower division classes.

Some GSI's and GSR's were seeking only masters degrees but, if Association's witnesses are representative, most were enrolled in Ph.D. programs. Although the requirements vary from department to department, a Ph.D. degree is generally awarded only after a student has completed required course work, passed oral and written exams, formulated an acceptable prospectus for a dissertation, and completed the dissertation. Only 16 of 101 departments require that students teach undergraduate courses.

Graduate students pay for their education in various ways, including loans, fellowships, employment within or outside the University, and use of personal or family funds. More than 50 percent of the money received by graduate students from the University comes from employment as GSI's and GSR's. In 1984-1985, the annual salary for students serving as GSI's and GSR's was in the neighborhood of $9,000 for one-half time work. Some departments use offers of employment to attract the most qualified students and promise financial support in their letters of admission. Some departments base the number of graduate students admitted upon how much money is available for graduate student employment in the department.

GSI and GSR positions are awarded on the basis of merit, not need; only 35 percent of the large departments and 19 percent of the small departments even take need into account. Employment income and financial aid come from different offices and involve different application procedures. In setting the salaries for GSI's and GSR's, the University considers the educational impact as well as fiscal impact and may raise salaries when tuition and fees increase. The University tries to equalize the net salary for GSI's and GSR's to avoid one position being preferred over the other.

GSI's and GSR's receive limited fringe benefits, consisting generally of faculty cards with special library privileges, Xerox and secretarial services, mailboxes in their departments and sometimes parking privileges and housing lists. Where teaching is required by the department, GSI's receive credit towards their degrees. Where teaching is not required, they may receive credits which do not count toward their degrees but permit them to maintain registered student status while taking fewer courses than otherwise required. Most departments provide similar credits for research performed by GSR's.

### CHARACTERISTICS OF GSI EMPLOYMENT

About 75 percent of all graduate students serve as GSI's at some time during their academic careers. According to a University rule, GSI's may not teach more than four years without special permission. The rule has two purposes: to ensure expedited completion of the degree work, and to help distribute financial support opportunities among the students. University's evidence showed that nearly half of the GSI's taught two semesters or less and over 70 percent taught for two years or less. However, Association presented several witnesses who worked as GSI's more than four years and presented testimony showing that most GSI's in some departments teach as many as six years.

Often, particularly in the language departments, GSI's teach only introductory undergraduate courses. Some departments, including rhetoric, history, physics, chemistry, computer science, and biology hire GSI's who are studying in other departments. A chemistry professor testified that in his department this was the exception, not the rule. But another witness testified that survey results showed that 60 percent of the large departments and 40 percent of the small departments hire GSI's from outside their departments.

GSI appointments are limited to 50 percent of full-time employment. Witnesses explained the purpose of the limitation as either to avoid payment of health and other benefits payable for those considered full-time employees or to prevent employment from interfering with degree work. PERB also found evidence that the one-half time restriction might be designed to permit the University to consider its GSI's and GSR's as full-time students for purposes of state funding. In spite of the nominal limitation, if the need arose a GSI might work as many as 50 hours in one week.

The amount of supervision by full-time faculty varies from course to course and faculty member to faculty member. Diligent faculty members may meet with GSI's every week and observe GSI discussion sections and labs periodically. But some faculty members rarely or never observe GSI's

teaching and rarely meet with them. GSI's teaching upper level courses and research seminars are generally not supervised after the faculty members have approved their topics and texts. However, all graduate students work closely with the faculty members who serve as their graduate advisors and dissertation committee members.

Most of the GSI's called as witnesses by Association testified that their educational goals were to complete their degrees in order to obtain employment in universities. They took GSI positions in order to earn enough money to support themselves during graduate school. Some of these witnesses admitted secondary goals of becoming good teachers. University witnesses believed that the mutual objective of the students and the University is to produce scholars who would be able to transmit their knowledge to others. From University's perspective, GSI employment provides both financial support and valuable teaching experience.

One witness who taught the same courses a number of times, testified that while his first teaching job might have provided valuable experience, repeatedly teaching the same course did not. University witnesses found value in mastering and reviewing fundamentals, studying new developments, and acquiring the skill of transmitting information to others. Even repeatedly teaching the same introductory course could be valuable to a student.

Association witnesses repeatedly testified that time spent teaching took them away from their own course work and from work on their dissertations. But other evidence showed that some departments discourage students from accepting teaching assignments at critical junctures in their studies.

### CHARACTERISTICS OF GSR EMPLOYMENT

Some GSR's perform only clerical duties which provide little benefit to their education. Others perform research that does not directly relate to their own research and dissertation work. Often, however, the research performed by GSR's will provide some or all of the data necessary for their dissertations. Even when the research does not directly relate to a GSR's dissertation, the research skills learned while employed as a GSR may assist the student in working on a dissertation.

Although there are examples of GSR's who work with little faculty supervision, GSR's generally work closely with the professors responsible for their research projects. GSR's often work long hours, particularly when their research contributes to their dissertations; frequently they are working alongside other students who are not being paid for their research. Both the

students and the University benefit from most of the research performed by GSR's.

## THE REGENTS DECISION

In *Regents, supra,* 41 Cal.3d 601, the California Supreme Court held that housestaff who were paid by the University while participating in medical residency programs operated by the University of California (San Diego, Los Angeles, Irvine, Davis, and San Francisco campuses) were "employees" of the University entitled to collective bargaining rights. The court determined that housestaff's educational goals were subordinate to the services. performed. (*Id.,* at pp. 618-621.) In reaching this conclusion, the court considered the following five factors: (1) the quantity of time spent in direct patient care; (2) the amount of supervision received; (3) guidance housestaff provided for interns, nurses and other staff; (4) indicia of employment; and (5) the extent of the educational benefit and training received. (*Id.,* at p. 618.)

■ This petition challenges PERB's failure to reach a similar conclusion about the status of GSI's and GSR's. PERB found that neither group should be considered "employees" and afforded collective bargaining rights. Association challenges PERB's interpretation and application of the *Regents* decision and argues that PERB's factual findings are not supported by substantial evidence. Association relies heavily upon the dissenting opinion to PERB's two-to-one decision.

Both *Regents* and this case involve Government Code section 3562, subdivision (f) of HEERA. (Gov. Code, § 3560 et seq.) That subdivision provides: " 'Employee' or 'higher education employee' means any employee of the Regents of the University of California, the Directors of Hastings College of the Law, or the Board of Trustees of the California State University, whose employment is principally within the State of California. However, managerial, and confidential employees shall be excluded from coverage under this chapter. The board may find student employees whose employment is contingent on their status as students are employees only if the services they provide are unrelated to their educational objectives, *or,* [first prong] *that those educational objectives are subordinate to the services they perform and* [second prong] *that coverage under this chapter would further the purposes of this chapter.*" (Italics added.)

From a review of the statutory history, the *Regents* court concluded that California did not intend to follow National Labor Relations Board (NLRB) precedent preventing collective bargaining by housestaff, but adopted its own standard for determining if housestaff should be considered employees.

Considering the first prong of the statute, the court concluded that Government Code section 3562, subdivision (f) "makes clear that PERB should determine in each case whether '[the students'] educational objectives are subordinate to the services they perform.' " (*Regents, supra,* 41 Cal.3d at p. 614.)

The *Regents* dissent suggested that a student's "subjective" educational objectives could not be balanced against the "objective" services performed and argued that students would be "employees" only if "those students' educational objectives (in so performing services) are of less importance to them . . . than the services they perform." (*Regents, supra,* 41 Cal.3d at p. 640.) The *Regents* majority rejected this argument, saying: "While applying the Legislature's command may be difficult, that is no excuse for disregarding it altogether. The Legislature has clearly *not* instructed PERB to confine its inquiry to the students' state of mind. . . . [¶] The Legislature has instructed PERB to look not only at the students' goals, but also at the services they actually perform, to see if the students' educational objectives, however personally important, are nonetheless subordinate to the services they are required to perform. Thus, even if PERB finds that the students' motivation for accepting employment was primarily educational, the inquiry does not end here. PERB must look further—to the services actually performed—to determine whether the students' educational objectives take a back seat to their service obligations." (*Regents, supra,* 41 Cal.3d at p. 614, fn. omitted.)

The *Regents* majority agreed with PERB that housestaff's educational objectives were subordinate to the services they performed. The evidence showed that from their first year of residency, housestaff were immersed in all aspects of direct patient care. They supervised other hospital personnel, performed medical procedures in life-threatening situations without the presence of attending physicians, and treated many patients without consulting physicians. They commonly worked 80- or 100-hour weeks and spent 75 percent of that time in direct patient care. Administratively, they were treated like employees in most ways. While there was great educational benefit from the direct patient care they provided, patient demands were such that the services would be performed without regard to educational benefit. Many services they performed became routine and were of no continuing educational value. Housestaff's day-to-day routine was dictated almost entirely by the exigencies of injury and disease. (*Regents, supra,* 41 Cal.3d at pp. 618-621.)

Addressing the second prong of the statute, the court agreed with PERB that granting collective bargaining rights to housestaff would further the

purposes of the statute. The court acknowledged PERB's expertise in this area and accepted its findings that the various employment concerns could best be handled by the collective bargaining process, that granting collective bargaining rights would minimize the potential for strikes, and that bargaining over hours and working conditions might result in higher quality health care. (*Regents, supra,* 41 Cal.3d at pp. 622-623.)

## PERB's Distortion of the First Prong

Had PERB merely applied the *Regents'* formula to the evidence presented in the current case, review by this court would have been straightforward. However, PERB complicated the matter by purporting to "recalibrate" the scale to account for differences between *Regents* and this case. PERB explained its action by saying that the "factual backdrop of *Regents* is so unique that it severely limits *Regents'* application to the instant case." PERB described *Regents'* purportedly unique backdrop: "In *Regents,* the California Supreme Court considered the status of individuals who had graduated from medical school with a doctor of medicine (M.D.) degree and who worked at hospitals owned or operated by the University. The employees in question in *Regents,* unlike here, worked full-time and engaged in no academic course work. To qualify to practice medicine in California, these individuals (housestaff) must participate in an approved residency program. Generally, housestaff rotate through the different hospital services relevant to their specialty. The residency program requires extremely long hours, usually 80 to 100 hours per week, and lasts two to six years depending on the specialty. From the first year of residency, housestaff are involved in all aspects of direct patient care with little or no supervision, and are even required to supervise other hospital personnel, such as nurses and technicians. Housestaff salaries vary, but they receive annual step and cost-of-living increases. Housestaff also receive fringe benefits, including medical coverage, medical malpractice insurance, workers' compensation insurance and paid vacation."

PERB then described the differences between housestaff and GSI and GSR positions. Because the differences were great, PERB felt obliged to "exercise its jurisdiction and expertise to further interpret subdivision (f) and the court's application of that provision in *Regents.*" This is where PERB got into trouble. Instead of taking the *Regents* court at its word, PERB found that the dissent had "aptly" noted that one cannot balance apples and oranges without calibrating the scale, and concluded that the scale was "more easily read in *Regents*" than in this case. PERB then "recalibrated" the scale: "Instead of looking at each side of the scale and weighing each interest (academic and employment) independently, a more helpful approach is to

examine how the two interests interrelate and determine which side ultimately prevails when the two interests conflict. The result of such an approach sheds light on which of the two interests is 'subordinate' or, in the words of the Supreme Court, which 'takes a back seat.' Furthermore, by examining the balancing test from this new perspective, we avoid having to weigh subjective against objective factors in reaching our conclusion."

PERB then put the newly calibrated scale to use: "For example, although the students testified that their appointments sometimes interfered with their own courses or research, the University's policy of not approving reappointments in cases where the students were not making adequate progress towards their own degrees assures that ultimately academic interests prevail. Furthermore, the record reflects that the faculty actually discouraged the students they were advising from continuing to teach if the teaching appointment was substantially slowing or interfering with their academic progress. Academics also prevail over employment in the formulation, implementation and/or application of the University's policies regarding grievance resolution, layoff, admission and compensation.

"Weighing the facts of this case on our newly calibrated scale, we find that in cases of conflict between academic and employment considerations, academic considerations ultimately prevail. We therefore conclude, based upon the record as a whole, that the students' educational objectives are not subordinate to the services they actually perform as GSIs and GSRs."

In essence, PERB announced a new test for determining whether educational objectives are subordinate to services. The test focuses on areas of conflict between educational objectives and services and looks to which considerations ultimately prevail. If this test were merely an extension or application of *Regents*, PERB would have been within its authority. But the test contradicts the test established by *Regents*. PERB's test contradicts *Regents*' test because it does not examine in aggregate the educational objectives of the students and compare them with the aggregate of the services rendered. Instead it extracts those services which conflict with educational objectives and examines how conflicts are resolved. PERB lacks the authority to change the *Regents* test. (See *Henning v. Industrial Welfare Com.* (1988) 46 Cal.3d 1262, 1270 [252 Cal.Rptr. 278, 762 P.2d 442].)

In its brief to this court, PERB justifies recalibrating the scale: "PERB noted that *Regents* does not dictate how PERB is to determine if educational objectives are subordinate to the services rendered. PERB also recognized that the 'case-by-case' analysis under section 3562(f) compels PERB to

'recalibrate' the scale when the circumstances so dictate in order to assess appropriately the weight to be given the relevant factors in the analysis. PERB concluded that indicia of employee status, which in *Regents* clearly weighed on the services side, were outweighed by indicia of student status in the instant case. In addition, the services rendered were a component of the total educational program and hence were 'entwined' with the educational objectives. Recognizing that, unlike *Regents*, the two sides of the scale were closely interrelated and hence the scale could not be as easily read as in *Regents*, PERB reasonably concluded that the scale had to be 'recalibrated.' Clearly, the resulting 'recalibration' of the scale cannot be equated with a repudiation of the principles in *Regents*. Rather, it was a reasonably necessary step in fulfilling the required case-by-case analysis."

PERB has become more circumspect in defending its decision than it was in making it. Instead of boldly announcing that its recalibration of the scale allows it to "avoid having to weigh subjective against objective factors," the difficult task the Legislature and *Regents* enjoined it to perform, PERB now explains that recalibration of the scale merely makes it easier to read. However, PERB's justification for its decision neither enlightens us nor brings into focus any purported fuzziness in the statute or in the *Regents* court's interpretation of the statute. Instead, it reveals PERB's resistance to the analysis and holding of the *Regents* majority.

"Case-by-case analysis" would call upon PERB to consider *all the ways* in which GSI and GSR employment meet educational objectives of the students and *all the ways* in which the employment provides services and to compare the value and effectiveness of the employment in meeting the students' educational objectives with the value and effectiveness of the employment in providing services. PERB, with its expertise, would then make a judgment about whether the employment was more valuable and effective in meeting educational objectives or in providing service to the University: whether the "educational objectives are subordinate to the services" the students perform. In the course of comparing educational objectives with services PERB could, as did the *Regents* court (*Regents, supra,* 41 Cal.3d at p. 621), take note of how conflicts between the two were normally resolved. But the result would not be dictated by how the University resolved these conflicts.

PERB said that it was unable to perform the balancing function on the scale it had received from *Regents*. We disagree. The PERB dissent revealed how the comparison might take place. The majority was not obligated to agree with the dissent's evaluation of the evidence, but it should not have ignored the process explained by the dissent. In its brief to this court, PERB

reveals that it does know how to perform the evaluation dictated by the statute and by *Regents*. In a section of the brief designed to show that the decision is supported by substantial evidence, PERB discusses at great length the ways in which employment satisfies educational objectives and compares them with the services rendered. PERB should have performed this analysis before it decided the case, not as a justification for its decision after it was made.

PERB's analytical error stemmed from its view that *Regents'* unique facts justified changing the test and from its failure to acknowledge that the facts of each case are unique. The Legislature prescribed a test for PERB to apply on a case-by-case basis to whatever facts were presented. The facts PERB found "unique" to *Regents* influenced PERB's determination that housestaff were employees. On different facts, PERB might reach a different conclusion, but the test would always remain the same. PERB should have been looking for a better way to evaluate student's educational objectives and to compare them with the services they performed, not for an excuse to "avoid having to weigh subjective against objective factors."

PERB's analytical error may also be blamed on the *Regents'* dissent's inapt metaphor of weighing apples and oranges. By concentrating on the metaphor of a grocery scale PERB lost sight of the fact that the statute and *Regents* decision call for a value judgment about which is subordinate, not a scientific weighing process. Had it viewed the decision as a value judgment, PERB might have realized that the subjective/objective dichotomy was not an obstacle to its decision.

PERB's distortion of the first prong renders suspect its conclusion that GSI and GSR educational objectives are not subordinate to services. Unless saved by its ruling on the second prong, PERB's decision must be set aside and PERB required to reconsider the matter under the correct test.

## THE SECOND PRONG OF THE STATUTE

Having found that the students' educational objectives were paramount, PERB was not required to reach the second prong of the statutory test. However, PERB did reach the second prong and resolved it in University's favor. PERB found that the purposes of HEERA would not be furthered by treating GSI's and GSR's as employees. ■■■ University and PERB urge us to uphold PERB's decision on that ground even if PERB did not correctly apply the first prong. Association insists that PERB also erred in its ruling on the second prong of the statutory test. We agree with University and PERB that PERB correctly applied the second prong.

In its decision on the second prong, PERB noted that HEERA's stated purposes include both "development of harmonious and cooperative labor relations between the public institutions of higher education and their employees" (Gov. Code, § 3560, subd. (a)), and "to encourage the pursuit of excellence in teaching, research, and learning through the free exchange of ideas among the faculty, students, and staff" (Gov. Code, § 3561, subd. (c)). PERB observed that the administrative law judge who heard this matter concentrated only on the former purpose and did not address the academic nature of the professor-student relationship.

PERB concluded that treating GSI's and GSR's as employees would not further the purposes of HEERA because: (1) the mentor relationship between professors and students would be damaged; (2) it might interfere with the University's use of employment opportunities to attract the most qualified students; (3) it could create arbitrary distinctions between the work conditions for graduate students working for pay and those doing unpaid research; (4) it could interfere with the selection procedures for instructors and researchers, causing economic considerations to replace academic considerations; (5) it would split employed graduate students into two competing labor groups, GSI's and GSR's, and undermine the harmony of the present situation; (6) the free exchange of ideas would be sacrificed by bargaining because economic issues and academic issues could not be separated.

Association challenges PERB's various conclusions on substantial evidence grounds. It fights an uphill battle. As explained in *Regents, supra,* 41 Cal.3d at page 622, the determination under the second prong of the statute "necessarily involves questions of fact and policy. It is . . . necessary to bear in mind PERB's expertise in this area."

PERB's expertise is particularly important here, where application of HEERA depends upon predicting the effect collective bargaining would have upon the academic environment of the University. No one can accurately predict the future. But PERB's expertise in public employment relations positions it best for making an educated guess.

In *Regents,* PERB found that bargaining on wages, hours and working conditions would further the purposes of the statute and that denying housestaff collective bargaining could lead to strikes and a lesser quality of care. (*Regents, supra,* 41 Cal.3d at pp. 622-623.) Because of its expertise and the reasonableness of its conclusions, the *Regents* court deferred to PERB. (*Id.,* at p. 623.) PERB's opposite conclusion with respect to GSI's and GSR's is also reasonable. We defer to PERB.

The standard of review enjoined upon us is to " 'uphold the Board's decision if it is supported by substantial evidence on the whole record.' " (*Regents, supra,* 41 Cal.3d at p. 617, quoting *Rivcom Corp.* v. *Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 756-757 [195 Cal.Rptr. 651, 670 P.2d 305].) Much of the administrative record here addresses only the first prong of the statute and is not pertinent to our review of PERB's determination on the second prong. However, the testimony of Dr. Robert R. Bickal is both pertinent to the second prong and substantial.

Dr. Bickal testified that he had been employed in labor relations for over 20 years. Currently employed by University as a labor negotiator, he was an English professor at various eastern colleges and universities for about 20 years and served a 10-year stint as director of employee and labor relations for Rutgers University. He had personally dealt with about 200 impasse situations and had consulted on labor relations for various colleges and universities.

Dr. Bickal testified about risks involved in providing collective bargaining rights for GSI's and GSR's. First, however, he pointed out that collective bargaining is generally more effective for full-time, long-term employees than for part-time, short-term or transitory employees. He then explained that for students employed in jobs related to their educational objectives it is very difficult to identify what constitutes a condition of employment and what constitutes a part of the student's educational experience. He discussed in some detail the complex and fragile mentor/student relationship between graduate students and professors. In his opinion, collective bargaining would interfere with these unique relationships. This could do serious damage to the stature of the institution and affect its ability to attract and retain the most able and productive faculty and the brightest and best graduate students.

In Dr. Bickal's opinion, bargaining over discipline would interfere with a responsible faculty member's ability to ensure that a student is properly balancing academic progress with employment. Bargaining over job security could hamper the University's ability to encourage students to move forward rapidly with graduate work and to free up funds to attract new graduate students to the programs. Dr. Bickal was also concerned that bargaining over performance evaluations might reduce the flexibility in work assignments and interfere with faculty ability to direct students to appropriate kinds of work. Negotiating about hours would be extremely difficult. For GSR's it would be difficult to separate employment hours from hours dedicated to the students' own research. For GSI's, whose hours fluctuate widely, bargaining

over hours would be impractical. If all these issues were removed from the bargaining process, too few significant or meaningful issues would remain to make the process worthwhile.

Another University witness, who had taught abroad, testified that collective bargaining by Dutch graduate students has led to a stagnant system because it has saturated the university system with permanent employees and prevented talented people from pursuing academic careers. PERB evidently found these witnesses more persuasive than the Association witness who had negotiated agreements while a graduate student at the University of Michigan and who presented a favorable picture of the process and its results.

Association answers the concerns of the University witnesses by questioning the existence of a mentor/student relationship between GSI's and faculty, pointing out that the University has conceded bargaining rights for other graduate students employed as readers, tutors and acting instructors, and suggesting that any concerns with intrusion upon academic freedom or educational policies is premature and unwarranted because the "scope of representation" is specifically reserved for later proceedings.

Association's arguments are thought provoking, but they in no way undermine PERB's expertise or the evidentiary basis for its conclusion that the purposes of HEERA would not be furthered by granting collective bargaining rights to GSI's and GSR's.

Although HEERA strongly states that one of its purposes is to provide procedures for meeting, conferring and resolving impasses (Gov. Code, § 3561, subd. (a)), it also states clearly that not all student "employees" are covered by the act (Gov. Code, § 3562, subd. (f)). We consider it no accident that the Legislature left open the question of which students should be considered employees within the meaning of HEERA and that it empowered PERB to determine whether the purposes of HEERA would be furthered by covering graduate student employees. The Legislature, no doubt, was aware of the vital research and instructional roles played by graduate students—it participates each year in adopting the University's budget. Implicitly, the Legislature concluded that PERB was better equipped than either the Legislature or this reviewing court to determine whether the purposes of the act would be furthered by coverage of GSI's and GSR's. (Gov. Code, §§ 3563, 3564, subd. (c).)

The evidence before PERB warned of intractable problems in defining and limiting the scope of representation to prevent interference with academic policy. PERB was not required to conduct a laboratory experiment by

granting bargaining rights and then overseeing difficult and potentially protracted efforts to define the scope of that representation. Nor was it required to permit bargaining which it believed could interfere with the mentor/student relationship.

PERB properly concluded that HEERA's policy of encouraging "the pursuit of excellence in teaching, research, and learning" (Gov. Code, § 3561, subd. (c)) would not be furthered by covering these graduate students. The University is one of the leading educational institutions in the United States. It attracts some of the most talented students in the world. At least a part of the attraction for students is its relatively low cost, when compared to most private institutions. Using graduate students as instructors and to help justify research funding assists the University in keeping its costs low. The University has struck a delicate balance between employment and financial support to attract and assist these graduate students. This well-tuned system could easily be disrupted by introduction of collective bargaining on the behalf of thousands of graduate students whose self-interest might outweigh concern for the institution. Absent legislative direction or compelling evidence that the institution would not suffer, PERB was not required to rule in Association's favor.

PERB's decision is affirmed. Association's request for attorney fees and costs is denied.

Merrill, J., and Chin, J., concurred.

A petition for a rehearing was denied June 11, 1992, and the opinion was modified to read as printed above. Petitioner's application for review by the Supreme Court was denied August 13, 1992.